STATE of Missouri ex rel. H. Sam PRIEST, President, Russell L. Dearmont, Alphonse G. Eberle and Kenneth Teasdale, as Members of, and Constituting, the Board of Police Commissioners of the City of St. Louis, Missouri, Relators,

v.

Donald GUNN, President, Carl Gassel, Leo J. McLaughlin, James W. Noonan, T. H. Mayberry, John T. Curry, Archie Blaine, Raymond Leisure, Anton Niemeyer, Louis Aboussie, James E. Geisler, Albert Villa, Fred W. Haag, George J. Grellner, Joseph E. Kavanaugh, A. J. Cervantes, Thomas J. Finan, Joseph P. Roddy, Wayman F. Smith, Jr., DeWitte T. Lawson, Edgar J. Feely, A. Barney Mueller, Alfred Harris, John A. Sartorius, Anthony T. Mascazzini, Joseph B. McDonald, William C. Brady and Joseph F. Noel, as Members of, and Constituting the Board of Aldermen of the City of St. Louis, Missouri; Raymond R. Tucker, John H. Poelker and Donald Gunn, as Members of, and Constituting, the Board of Estimate and Apportionment of the City of St. Louis, Missouri; Raymond R. Tucker, as Mayor of the City of St. Louis, Missouri; John H. Poelker, as Comptroller of the City of St. Louis, Missouri; John J. Dwyer, as Treasurer of the City of St. Louis, Missouri, Respondents.

No. 47492.

Supreme Court of Missouri,
En Banc.
June 13, 1959.

Robert F. Schlafly, Robert J. Keefe, Keefe, Schlafly, Griesedieck & Ferrell, St. Louis, for relators.

Charles J. Dolan, Acting City Counselor, Eugene P. Freeman, Associate City Counselor, Samuel H. Liberman, Lewis, Rice, Tucker, Allen & Chubb, St. Louis, for respondents.

EAGER, Judge.

In this mandamus proceeding the members of the Board of Police Commissioners of the City of St. Louis seek to compel the City Board of Estimate and Apportionment, the Board of Aldermen, and the appropriate City officials, to approve, appropriate and pay an additional sum of $461,-331.42 for the maintenance of the police department for the fiscal year ended March 31, 1959. Issues were made up from the Petition and Exhibits, the Answer and Return, and a Response to the Return. From these and a stipulation the following facts appear.

Pursuant to section 84.210 (all statutory references are to RSMo 1949, V.A.M.S., unless otherwise stated) the Police Board prepared and delivered to the City on or about March 28, 1958, its estimate of the amounts necessary to meet the expenses of the department for the next fiscal year. The amount so fixed, exclusive of the amount needed for the Pension System which we may ignore, was $14,232,352.87. To this estimate were attached a "Detailed Budget Request," breaking the amount down into certain classifications, and a "Work Sheet," giving very specific details as to the personnel. The Board of Estimate and Apportionment consisted of Respondents Tucker, Poelker and Gunn; it asked the Police Board to re-examine and reduce this estimate; it was thus re-examined, but the Board determined that no reduction was possible. Thereupon, the Board of Estimate and Apportionment (which has the duty under the City Charter to recommend all appropriation bills) reduced various items in this budget request and submitted it, as reduced, in a general appropriation bill to the Board of Aldermen. An ordinance was duly enacted appropriating the reduced amounts. The total appropriation was $13,592,352.87, or a reduction of $640,000. Reductions were made as follows in allowances for: "Commissioned Salaries" (i. e. Police Officers)—$360,000; "General Supplies and Expenses"—$37,000; "Light, Heat and Power"—$50,000; and "Auto Radio & Guns"—$217,000. Other relatively minor reductions made up the remainder. The item of "Non Commissioned Salaries" (actually salaries of civilian employees) was increased $61,000. Suitable protests were made by the Board, but the City proceeded, generally, on the basis of the reduced budget. It did, however, during the year, and particularly towards its end, transfer certain funds from one or more police accounts to others in order to prevent overdrawing one or more depleted accounts. On February 11, 1959, defendant Poelker, as Comptroller, refused to approve and so far as we are concerned the City rejected certified claims for $27,843.20 for the purchase of fourteen police cars, and for $17,228.70 for the purchase of gasoline, upon the ground that there were insufficient funds in the accounts for equipment and supplies to pay these sums. After some

negotiations the City did pay in full the payroll for "Commissioned Salaries," or police officers, although it had originally reduced that request drastically; in so doing, the Comptroller supposedly exercised his "emergency powers" to the extent of $71,000, amounting to an overpayment of the funds actually appropriated. The civilian salaries were paid for eleven and one-half months, but a default of $96,943.-93 remained at the end of the fiscal year. This, actually, was paid on or after April 1, 1959, but was charged to the next fiscal year, so it remains as a deficit here. The Petition for Mandamus was filed on February 23, 1959. The pleadings state that the total amounts of which payments were refused to and as of the end of the fiscal year consisted of the above $96,743.93 in civilian salaries, and $364,587.49 claimed and certified as due for supplies, equipment, contractual services and miscellaneous; obviously, the total is $461,331.42.

Section 84.100 (as amended in 1957—see Cum.Supp.) provides for a maximum of 1,704 patrolmen and 35 turnkeys. Sections 84.150 and 84.160 (as also then amended) provide for the appointment of various ranking officers, sergeants, detectives, etc., and fix the salaries of these and of all patrolmen.[1] Other significant parts of the applicable statutes are as follows: Section 84.100—"To enable said boards to perform said duties imposed upon them, they are hereby authorized and required to appoint, enroll and employ a permanent police force for the said cities which they shall equip and arm as they may judge necessary. * * *" Section 84.190—"1. The said boards shall be and they are hereby authorized to provide themselves with such office and office furniture, and such clerks and subordinates as they shall need; and to have and use a common seal. They shall

divide the said cities[2] into twelve police districts, and provide in each of them, if necessary, a station house or houses, with all things and equipments required for the same, and all such other accommodations as may be required for the use of the police." Section 84.210—"1. It shall be the duty of said boards, within thirty days after sections 84.010 to 84.340 shall take effect, and annually thenceforward on the thirty-first day of March of each year to prepare, in writing, an estimate of the sum of money which will be necessary for each current fiscal year, to enable them to discharge the duties hereby imposed upon them, and to meet the expenses of the police department, and they shall forthwith certify the same to the board of common council or municipal assembly, as the case may be, of said cities, who are hereby required to set apart and appropriate the amount so certified, payable out of the revenue of said cities, after having first deducted the amount necessary to pay the interest upon the indebtedness of said cities, the amount necessary for the expenses of the city hospital and health department, the amount necessary for lighting the city, and any sum required by law to be placed to the credit of the sinking fund of said cities."

As part of the expense of civilian personnel, the estimate of the Board included the following: "10 Matrons (1st class)" $36,000; "10 Matrons (2nd class)" $32,100; "58 Prison Guards" $214,020; "214 School Crossing Guards" $165,208. Respondents contest the propriety of the employment and the payment of all these classes of employees, as indicated later. It is necessary, therefore, to describe their duties and status briefly, referring to the stipulation of facts. We contrast the first two classes with "turnkeys," a statutory job classification. A turnkey's primary duty is the re-

---

[1]. We are told that at the times here in question the force was maintained at its full commissioned strength of 2,014 men, and the "Work Sheet" of the estimate is based on that assumption. Certain civilian personnel have long been employed in the department.

[2]. The word "cities" appears in certain of these sections because they are, strictly speaking, applicable to all cities "of five hundred thousand inhabitants or over." They should be considered here as applicable solely to the City of St. Louis. The same is true of the word "boards."

tention of custody of male prisoners and he keeps the keys to the cell block and cells; he wears a regulation uniform and is armed; he receives prisoners from policemen, records in a register the data on all those received and released, and keeps copies of the arrest sheets and removal orders; he provides generally for the feeding and care of the prisoners, and performs some cleaning or so-called "housekeeping" functions within the cells. He may not receive, release, or transfer a prisoner except in the presence of a police officer; he is subject to other police assignments (an infrequent occurrence, in fact) and to the discipline provided for police officers; the statutory salary is $4,200 per year. At present all turnkeys are assigned to the "Holdover" at Police Headquarters, and none are assigned to the district stations.

"Prison Guards" have been employed by the department since 1906; they operate under civilian working conditions and discipline, being subject to dismissal "without cause." The salary is $3,465 per year. They are furnished regulation uniforms, badges and pistols, but are not required to wear the uniforms or carry the arms; it is not shown whether they ordinarily do so or not. These men are licensed by the Board as "Private Watchmen." Their duties are "substantially the same as that of turnkeys regarding the custody of prisoners" (quoted from the stipulation). They are all presently assigned to the district stations, but in the past some have been assigned to Headquarters. When and if they work together, a turnkey has supervisory control over a prison guard. In five district stations prison guards operate telephone switchboards located within the cell block. They are sometimes used as substitute chauffeurs in cars or patrol wagons, but in the latter event a police officer is always present.

"Matrons" have been employed as civilian personnel since before 1899. They are not "assignable" to law enforcement duties and are not subject to police discipline. Seventeen were employed at the time the present petition was filed, and seven of these were doing clerical work exclusively. The other ten keep the keys of the cell block and cells for female prisoners at Headquarters and, in substance, have the custody of those prisoners; they are responsible for the care and feeding of the prisoners, and for the cleaning of their cells; they admit and release prisoners only in the presence of a policeman, and record the appropriate data in a register, doing the incidental "clerical work" as described for prison guards. They may not move a prisoner in or out of a locked cell without a policeman being present. They search female prisoners when admitted, but in the presence of a policeman. They wear "smocks" furnished to them, have no badges and are not armed; they are paid from $3,204 to $3,465 per year; their working hours, vacations and mode of termination are those of civilian employees.

"School Crossing Guards" are carried by the Board as part-time civilian employees; they were first employed, as such, in 1955. Prior to that time the same duties were performed "to a limited extent" by full-time members of the police force; the guards have since been employed in order to relieve policemen for other duties. As the name implies, these employees are stationed at school crossings, where they escort the children and protect them from traffic; generally, they wait for breaks in the traffic and do not "direct traffic" in an all-inclusive sense; they are said to have "no powers of a police officer," they are not armed, and they wear no uniforms; they do wear caps, arm bands or badges and a metal badge or "disc." They are paid $4 per day for each day actually worked. They are not assignable to general police duties, and are not subject to police discipline.

The Police Board has compiled and published annual reports since 1899, as required by section 84.250 (§ 6224 RSMo 1899); these have uniformly listed all job classifications, numbers of employees and salaries; the classifications just described

have been thus listed since the inception of the respective employments. The appropriate officials of the City have uniformly approved, appropriated and paid these salaries, except as stated herein for the fiscal year now in question.

For convenience, we shall refer to the Respondents, collectively, as the City, and to Relators as the Board. The City has conceded that the State may create a metropolitan police force in a city such as St. Louis, and require the City to maintain it as a state function; in other words, it recognizes the presently binding force of the case of State ex rel. Hawes v. Mason, 153 Mo. 23, 54 S.W. 524. But it insists that the St. Louis Police Statutes, as previously outlined, are unconstitutional as an unlawful delegation of legislative power (Sec. 1, Art. III, Mo.Const., V.A.M.S.) if construed and enforced as the Board does, and seeks to do, here. As more or less corollary arguments, violations are also urged of Sec. 1, Art. X, which vests the taxing power for state purposes in the General Assembly, and of Sec. 1 of Art. II, declaring the Distribution of Powers of the government. More specifically, the basic contentions are: that these statutes contain no sufficient limitations and no declaration of "such conditions, rules, regulations and standards" for the employment of "clerks and subordinates" (in number or salaries) or for the procurement of "arms and equipment" (in types or amounts) as permits the City or a taxpayer to determine the amount to be "gathered from taxes" therefor; that the statutes thus vest an unbridled discretion in the Police Board and delegate the legislative power to tax; that the exemptions of funds for hospital and health purposes, street lighting, etc. constitute no real limitation and that the Board could arbitrarily demand the entire remainder of the City's revenue if the statutes are followed literally; that "Matrons" and "Prison Guards" are not "clerks and subordinates," but are in substance turnkeys, and are thus additional and unauthorized members of the police force; that "School Crossing Guards" are actually additional patrolmen, and if not such, then they perform purely local functions which the State may not provide at the City's expense. The matter of estoppel is also argued pro and con, and will be alluded to later.

We deemed this matter to be of sufficient public interest and urgency to justify the waiver of our Rule 1.23, 42 V.A. M.S., which requires the presentation of such a petition to a lower court. We shall therefore determine the case on its merits. All must and do concede that the legislature may not relegate to an administrative officer or board its power to legislate, or, specifically, the power to tax. 42 Am.Jur. Public Administrative Law, § 44, pp. 339–342. But the legislature may enact the basic purpose or rule, leaving matters of detail in administering the act to the board or executive, although an exercise of discretion by the latter may thus be involved. State v. Local No. 8–6, Oil, Chemical and Atomic Workers International Union, AFL-CIO, Mo., Banc, 317 S.W.2d 309, 323; Spitcaufsky v. Hatten, 353 Mo. 94, 182 S. W.2d 86, 109, 160 A.L.R. 990. And, as held in Ex. parte Williams, 345 Mo. 1121, 139 S.W.2d 485, 491, certiorari denied Williams v. Golden, 311 U.S. 675, 61 S.Ct. 42, 85 L.Ed. 434, a legislative body may define the areas and purposes covered and empower the appropriate officers, boards, or commissions to ascertain the relevant facts, to make their determinations accordingly, and to carry out the details. In American Power & Light Co. v. Securities and Exchange Commission, 329 U.S. 90, 67 S.Ct. 133, 91 L.Ed. 103, the court said, with reference to a somewhat similar contention, at 329 U.S. loc. cit. 104–105, 67 S.Ct. loc. cit. 142: "But these standards need not be tested in isolation. They derive much meaningful content from the purpose of the Act, its factual background and the statutory context in which they appear. * * * The judicial approval accorded these 'broad' standards for administrative action is a reflection of the necessities of modern legislation dealing with complex

economic and social problems. See Sunshine Anthracite Coal Co. v. Adkins, 310 U.S. 381, 398, 60 S.Ct. 907, 914, 84 L.Ed. 1263. The legislative process would frequently bog down if Congress were constitutionally required to appraise beforehand the myriad situations to which it wishes a particular policy to be applied and to formulate specific rules for each situation. Necessity therefore fixes a point beyond which it is unreasonable and impracticable to compel Congress to prescribe detailed rules; it then becomes constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." In State v. Local No. 8–6, etc., supra, the court said, at 317 S.W.2d loc.cit. 323, 324: "It is not necessary that statutes prescribe a rule of action where they deal with situations which require the vesting of discretion in a public officer such as where the discretion relates to a police regulation and is necessary to protect the public health, safety and welfare. Ex parte Williams, 345 Mo. 1121, 139 S.W.2d 485, 490(10); Kalbfell v. City of St. Louis, 357 Mo. 986, 211 S.W.2d 911, 915(3). See also 16 C.J.S. Constitutional Law § 138, p. 575 and 42 Am.Jur. 337, Public Administrative Law, Sec. 43." And see, particularly, State ex rel. Mackey v. Hyde, Banc, 315 Mo. 681, 286 S.W. 363, 366, where the court said: "On the other hand, it is equally well settled that it is not necessary that statutes or ordinances prescribe a rule of action where they deal with situations which require the vesting of some discretion in public officials, as, for instance, where it is difficult or impracticable to lay down a definite, comprehensive rule; or where the discretion relates to the administration of a police regulation and is necessary to protect the public morals, health, safety, and general welfare; or where personal fitness is a factor to be taken into consideration."

We see that, inherently, the necessity of specific limitations, rules, regulations and standards in the legislation depends to a large extent upon the nature and purpose of the legislation, and also upon the practicability or impracticability of laying down "a definite, comprehensive rule" (Mackey, supra) in the legislation itself. And see Spitcaufsky v. Hatten, supra, 353 Mo. 94, 182 S.W.2d 86, loc. cit. 109, 160 A.L.R. 990. The legislation now being considered is an exercise of the police power in its truest and most elementary sense. While the City briefs separately its contention that there has been an unconstitutional delegation of the power to tax under Sec. 1 of Art. X, Mo.Constitution, that argument also rests upon a finding of an invalid delegation of the State's legislative power because of the absence of sufficient limitations, rules, and standards, for only upon that basis could the Board be said to have, even indirectly, any taxing power. We shall now consider the few cases which have ruled directly upon the validity and the enforcement of our police statutes.

In State ex rel. Hawes v. Mason, 153 Mo. 23, 54 S.W. 524, 526, the 1899 St. Louis Police Act was considered in a mandamus proceeding; that Act was very similar to one which had been in force since 1861. It prescribed the numbers, qualifications, grades and classifications, the salaries of the force and the method of removal of its members; it provided that the Commissioners should "equip and arm (the force) as they may judge necessary." It further provided that the number of policemen should not be "less than" 1,100 patrolmen (of two classes) and certain specified higher officers, detectives and "turnkeys." Touching the contentions that there was an unlawful delegation of legislative power, that property of the City was unlawfully taken without its consent, and that the Act constituted special legislation, the court held: (a) that the creation of a metropolitan police force with a requirement that the City support it was a proper function of the state government, and that the State might validly require a preferential appropriation by the city; (b) that, consid-

ering the Act as a whole, it was the intent of the legislature to fix the stated numbers as the maximum to be so employed; (c) that thus considered there was no unlawful delegation of legislative power or of any power to tax, and that the Act was valid and constitutional; (d) that this was not special legislation; and (e) that the existence of a Constitutional Charter did not affect the question. The peremptory writ was issued. The St. Louis Act has not been attacked in this court since the Mason case, so far as we have found.

The next case, State ex rel. Field v. Smith, Banc, 329 Mo. 1019, 49 S.W.2d 74, 75, involved the Kansas City Police Act (Chap. 38, Art. 23, RSMo 1929). That act specifically fixed the number of police officers and their salaries, gave the Board the power to arm and equip the force "as they may deem necessary," and also gave the Board authority "to appoint a traffic squad," to determine "the number, the grades and the rates of salary" thereof (the salaries not to exceed those of like grades in the general force) and to employ therefor such numbers as the Board deemed necessary. The Board was further given the power to divide the City into police districts. Primarily, the court considered the contention that legislative power had thus been improperly delegated; it expressly disavowed all intention to rule the validity of the St. Louis Police Statutes or those governing cities of the first class. The majority of the court held that in this act the legislature had delegated a "power to tax" without appropriate guidance or standards. In so doing it relied upon the power conferred to create a traffic squad of unlimited numbers, the fact that unlimited amounts of money might be demanded, the fact that the Board could substantially increase the number of employees (police and civilian) by adding as many new districts as it desired, and the fact that the provisions for arms and equipment and "clerks and other help" were without specific limitation. The entire act was held void. Two judges dissented. In the dissenting opinion

it was pointed out: that the statute provided specifically for the numbers, grades and salaries of the basic police force and of certain auxiliary personnel; that the legislature could not possibly determine for itself all the facts incident and necessary to the operation of a metropolitan police force with changing conditions and needs, or prescribe the kind and amount of equipment needed or the number of clerks and other employees; that the legislature here had declared the general public purpose and had merely delegated the authority to determine such details as were "necessary to a successful administration of the law"; and that such a law must of necessity be flexible. Certain differences between that act (which has since been substantially amended) and the present St. Louis Police Act are obvious. The specific criticism, in the majority opinion, of the Hawes case, supra, is inapplicable here, for the St. Louis Act was subsequently re-enacted in a substantially different form.

The question here essentially is: Considering the whole act, are the powers conferred within the permissible limits of delegated discretion? We are not convinced that the power to tax should be considered here as a point distinct and apart from the general question of the delegation of legislative power. We have already discussed this; see also the discussion in State ex rel. Hawes v. Mason, 153 Mo. loc. cit. 51, 54 S.W. loc. cit. 531; and the dissenting opinion in State ex rel. Field v. Smith, 329 Mo. 1019, 49 S.W.2d loc. cit. 82. The more recent cases, such as Kalbfell, supra (211 S.W.2d 911) and State v. Local No. 8–6, etc., supra (317 S.W.2d 309) indicate a broadening of the scope of the discretion which may be granted to administrative boards and officers by legislation of a strictly police nature. We shall not assume here that the St. Louis Police Board will exercise its discretion in an arbitrary and unreasonable manner in order that we might thus demonstrate an invalidity in the present act. As pointed out later, we differ with the Board upon cer-

tain of its constructions of the act, but that does not mean that the Act itself is invalid. The act has conferred upon the Board the right "to exercise discretion—not arbitrarily, but reasonably." State ex rel. Mackey v. Hyde, Banc, 315 Mo. 681, 691, 286 S.W. 363, 366.

Two other cases involving the administration of the Kansas City Police Act should be noted briefly. In State ex rel. Reynolds v. Jost, Banc, 265 Mo. 51, 175 S.W. 591, 592, mandamus was sought to compel the City to pay certain requests of the Police Board. The constitutional question urged here was not specifically raised in that case, the principal defense apparently being that the demand was unreasonable and that the Board had no right "to make a valid demand at all." The court reaffirmed the right of the state to create the police force and to require the City to support it as a state function, thus following the Mason case, supra. It further held: that the Kansas City Charter, if in conflict with the Police Act, constituted no impediment to the enforcement of the Act, since the Charter must be "consistent with and subject to the Constitution and laws of this state"; that the number of patrolmen "is the real basis of the force," and that this number, and the salaries of each class, were sufficiently fixed; that a change in the number of districts would make "but little change in the force," and that the law was rightfully intended to be flexible; that the Board might properly make its own estimate of the population in order to determine the size of the force (one patrolman to 700 inhabitants); and that if "the demand made is one thoroughly within the law," the court is powerless to act. Two Judges dissented there. One thought that the parties should, each year, "consult together" and apportion the revenue by agreement. Such a course would be a desirable end, here and elsewhere, but the Utopia has not yet come.

State ex rel. Beach v. Beach, Banc, 325 Mo. 175, 28 S.W.2d 105, 106, again presented a mandamus proceeding under the Kansas City Police Act, Rev.St.1919, § 8926. The City had questioned the reasonableness of the Police Board's request and estimate, and had appropriated a lesser sum. The Act provided that the Board should provide itself with " * * * a secretary and assistant secretary and such clerks and other help as may be necessary for the transaction of its business, and shall have power to divide the city into police districts and furnish all the necessary materials and provisions for a perfect and complete organization and equipment of the police force and police department of the city, * * *." The court held: that the City had no right to question the reasonableness of the amount estimated and requested, but that it did have the right to question whether certain items were lawfully included; that the Board was authorized to supply and employ such adjuncts and employees as might be necessary to the "organization of a complete police department," including bureaus of identification and records, garages, "machine, print, carpenter, plumbing and repair shops," an attorney and assistant attorney, and a bailiff; that two assistant chiefs, two assistant surgeons and a secretary to the chief of detectives were not authorized by the statutes, and that certain captains, sergeants and detectives were in excess of the number of policemen authorized. The salaries for these last two groups were disallowed. A peremptory writ issued for the amount requested, as thus amended. There was a vigorous dissent by one judge who felt that the statutes did not authorize the sundry civilian employees and adjuncts to the force, and that there was no room for any implied power.

We thus see that there has been much contrariety of opinion and no clear line of delineation in these cases. The statutory provisions and the facts in our case differ considerably from those in the cases discussed. A specific maximum police force is fixed and its salaries are fixed by classes; these salaries alone constitute 74.34% of the total budget request; the

Act gives precedence to certain other specified obligations of the city, which, of course, constitutes no actual limitation on police expenditures; it limits the number of police districts into which the city may be divided, with provisions for the equipment of each; there is no delegated power to create new squads or branches or divisions. Considering the present St. Louis Act as a whole (sections 84.010–84.340, RSMo 1949, V.A.M.S. and Cum.Supp. 1957), we hold that it is not unconstitutional as an unlawful delegation of legislative power, either generally or of the so-called power to tax; also, that it is not unconstitutional for any of the other reasons urged. It would be virtually impossible for the legislature to fix the type or amount or cost of "arms and equipment" needed for any given year or years; that discretion must of necessity be delegated. The phrase "clerks and subordinates" constitutes a reasonably sufficient statement of the legislative purpose and rule, and falls into the same category as "arms and equipment," construing (as we do) the term "subordinates" to mean civilian employees of a relatively inferior rank. We note here that the words "equip and arm as they may judge necessary," and "such clerks and subordinates as they shall[3] need," have appeared in the St. Louis Police Laws since 1861 (Laws 1860–61, pp. 449–450). By practical experience over a period of nearly a century, these areas of discretionary action have certainly been defined and delineated to a substantial degree, even though differences do now arise. All presumptions are in favor of constitutionality. State v. King, Mo., 303 S.W.2d 930, 932, and cases cited. It is true that in some respects the statutes applicable to Kansas City are more specific than sections 84.100–84.340, but we must and do construe the St. Louis Act as it is. The limitation of the St. Louis Police Board to a specific maximum portion of the City's general revenue (as does section 84.730 for Kansas City, Laws 1958, 2nd Extra Session,

pp. 159–160) would obviate much of the practical substance of the present objections, although it might not eliminate the theory of delegation or constitute a guide or standard. We mention this in order that the interested parties may, if they see fit, consider the possibility of amendatory legislation.

We proceed now to the remaining points. The City insists that even though the Act be constitutional, the sum of $448,128, representing salaries of prison guards, matrons and school crossing guards for the fiscal year, was unauthorized; and, as we understand, that the total amount of the Board's estimate and request should be decreased by that sum. The difficulty with this argument is that the City not only approved the full item of civilian salaries (including these) but actually paid them for the entire fiscal year, with the exception of the last half of March 1959. The total of civilian salaries for the latter period, amounting to $96,743.93 remained unpaid at the end of the year. Perhaps the appropriation did not conclusively bind the City (with the present controversies re the different accounts) but in so far as it has actually paid these salaries, as such, it may have no "set-off" therefor against other items in this mandamus proceeding. Consequently, we regard these salaries as involved to the extent of that part of $96,743.93 which represents the salaries of these three classes of employees. The fact that the City did not present in March 1959, its present reasons for the nonpayment is not determinative. The amounts are either lawfully included within the budget or not, and so far as not paid may be contested.

We shall consider these three classes of employees separately, keeping in mind also the classification and duties of "turnkeys," as specifically provided for in the St. Louis statutes since 1861 (Laws 1860–61, p. 449). It seems clear that the legislature has designated and provided for turnkeys as a part of the basic police force, and they are

3. The word "shall" was substituted for "may" in the 1899 Act (Laws 1899, p. 56).

carried and classified as such. A turnkey is a policeman who is primarily assigned to the custody of prisoners, but is subject to other police assignments (which, in fact, "very infrequently" occur). His duties were described in our statement of the facts. We see few, if any, material differences between the duties of turnkeys and of "prison guards"; the latter are classified as civilian employees, but only by action of the Police Board; their basic duties, rather than some more or less arbitrary classification, must control their status. Prison guards are issued arms and may carry them; they perform the same guard and custodial duties as do turnkeys, and this, according to the stipulation, is their "principal duty"; they keep the "in and out" records of prisoners as do turnkeys; they receive prisoners from and release prisoners to patrolmen or others of higher rank, as do turnkeys; their so-called "cleaning and housekeeping" functions are the same as those of turnkeys and are confined to the areas within the cells, janitors performing these duties elsewhere; they are assigned to duty in the district stations rather than in the Holdover, because turnkeys serve the posts there; in fact, turnkeys formerly operated in both places. We see no real materiality in the fact that prison guards incidentally handle the switchboards in five smaller district stations; nor is it material that they make certain clerical registration entries, for turnkeys perform identical work. Certainly, the actual keeping and custody of prisoners confined in a jail is the performance of an inherent and naked police function. The only real difference between turnkeys and prison guards is that by action of the Board the latter are classed and employed as civilians, and consequently operate under civilian working conditions as to hours, vacations, and mode of dismissal. They have been employed as such since July 1906. They are essentially police personnel; the act specifically provides for the classes, numbers and ranks of policemen, with stated maximums. The employment of prison guards, in legal effect, increases the number of police personnel beyond that maximum and is unauthorized. Holding, as

we do, that the prison guards are policemen, they cannot lawfully be employed and paid as civilian personnel, for that amounts to an evasion of the Act. The authority to employ "clerks and subordinates" (section 84.-190) appears in a section wholly apart from those authorizing the police personnel (sections 84.100, 84.150) indicating to us a complete absence of any legislative intention that any such "clerks and subordinates" should have police powers or act as substitutes for policemen. What we have said is in no way intended to reflect upon the Board or its members, for we all know that they are officials and citizens of the very highest type. They have simply followed a practice inherent in the department since July 1906. We may recognize the practice as an aid in our construction of the Act, but it is not controlling.

■ The City is not estopped from raising an objection to the employment of prison guards by its long continued recognition of that class of employees. While estoppel has, in very exceptional cases, been applied against municipal corporations by our courts (State ex inf. Shartel ex rel. City of Sikeston v. Missouri Utilities Co., 331 Mo. 337, 53 S.W.2d 394, 89 A.L.R. 607; State ex inf. McKittrick ex rel. City of Springfield v. Springfield City Water Co., 345 Mo. 6, 131 S.W.2d 525), it has been done "with much caution." The facts in the cases just cited were so different from ours that it is wholly unnecessary to discuss them. In so far as those salaries have been paid for the 1958–1959 fiscal year the city is now barred of relief, whether we call it estoppel, or, more properly, whether the question has to that extent, become moot. There is nothing in the prior recognition here which justifies or compels a perpetuation of unauthorized employment in the future. In mandamus the relators must stand upon the existence of a "clear unequivocal, specific right * * *" to enforce an act required by law, and the court may not coerce the performance of an unlawful act. State ex rel. Phillip v. Public School Retirement System of City of St. Louis, 364 Mo. 395,

262 S.W.2d 569. There being no enforceable right as to this class of employees, the question of estoppel is irrelevant here. Moreover, it is our duty to construe these statutes on the merits in so far as appropriate, for the public interest is vitally represented on both sides.

■ The "matrons," generally, are in the same situation as prison guards, except for the seven who are performing strictly clerical duties. The remainder perform duties in the women's cell block almost identical to those of prison guards in the men's department. True, they have no arms or uniforms, but they are charged with the primary custody of the women prisoners and they keep the keys. We rule that these matrons are police personnel and are not properly employed as "clerks and subordinates." The city should have paid those who are performing clerical duties exclusively.

■ The "School Crossing Guards" pose a different problem. They were first employed as civilian personnel in 1955, in order to relieve patrolmen for other police duties. To the extent that they are performing work which was previously performed by regular policemen, it might be said that they are performing a police function as the City contends. The City also says, in the alternative, that if these persons are not engaged in a police function, then they are performing services of a purely local nature for which the City is not required to pay under the Police Act. These Crossing Guards have been employed under the authorization of "clerks and subordinates." They do not direct traffic generally but only to the extent that it becomes necessary in escorting children safely across the street. If they are engaged in a state police function they are improperly classified and improperly employed, for they increase the police force above its authorized strength. If they are not performing such a function directly, then it seems clear that they are not performing an auxiliary function in aid of the police department, such as

would a machinist, a gunsmith or a clerk. Their action is a direct action, either as a police function or in the performance of a local function; they have no duties except those direct acts which were previously performed by patrolmen, and which constitute either a police function or a local function. We do not think they are properly "subordinates" of the department. The Board may not lawfully employ them as additional policemen under these circumstances, nor may it employ them to perform a local function. The State may not tax for the performance of local functions (Section 10(a), Art. 10, Mo.Constitution; State ex rel. Hawes v. Mason, 153 Mo. 23, 54 S.W. 524) and its agency, the Board, may not use tax funds for local purposes. In this particular situation it is only necessary to hold that the School Crossing Patrolmen are not lawfully employed by the Board as civilian employees or "subordinates." We do not rule that the Board may not perform this function as a state police function with proper personnel under the broad protective powers granted under section 84.090; paragraph (9) thereof specifically provides that it may enforce city ordinances not inconsistent with state laws. And section 84.330 declares that the members of the police force (not the "clerks and subordinates") of St. Louis are declared to be officers of the city under its charter and ordinances, as well as officers of the state. Nor do we rule that the City may not do likewise under its municipal powers. The function may well be one of both state and local concern, permitting separate or concurrent action. See § 31, Art. 6, Mo.Constitution, and Revised Code City of St. Louis (1948), Ch. 69, Traffic, Art. XI "School Stops," establishing a code of regulation for school crossings.

■ From what we have said it should be clear that the existence of a Constitutional Charter for the City of St. Louis is no impediment, either to the creation and operation of a State police force, or to the requirements for its support by the municipality. But see, also, State ex rel. Spink v. Kemp, 365 Mo. 368, 283 S.W.2d 502; In re

Petition of City of St. Louis, 364 Mo. 700, 266 S.W.2d 753, 755. Indeed the St. Louis Charter (Art. 1, § 1(21)) provides that the City shall have power "to provide and maintain police and excise departments when permitted by law," thus recognizing the controlling effect of the state laws on the subject.

■ The fact that the City operated at a deficit for the first eleven months of the fiscal year, and the needs of its other departments cannot be controlling or even persuasive here. It is conceded that there was more than enough money in the treasury, in excess of that required for the preferential purposes specified in section 84.210, to pay all requests of the Board. The legislature has spoken and we may only determine the validity of the Act and construe it. Nor is it material that the City reduced the police budget request only 4½%, whereas it reduced those of certain city departments 16%. We do not determine the wisdom or precedence of its various commitments.

■ While it has been held (State ex rel. Beach v. Beach, Banc, 325 Mo. 175, 28 S.W.2d 105) that the city has no power to question the reasonableness of the Police Board estimate, we hold that the courts may review it in a proper proceeding, solely to determine if its discretion has been arbitrarily and unreasonably exercised. The cases of State ex rel. Reynolds v. Jost, Banc, 265 Mo. 51, 175 S.W. 591, and State ex rel. Beach, supra, cited by the City, do not hold otherwise. There need be no "chaos" because of the existence of such a power, as the City suggests, for no court will attempt to "second guess" the judgment and discretion of the Board or substitute its judgment; likewise, we trust that only in entirely appropriate circumstances, when and if such ever occur, will resort be had to the courts. Our courts may review acts of public officials, agencies and administrative bodies to determine if a discretion has been arbitrarily and unreasonably exercised. In State ex rel. State Highway Commission v. Curtis, Banc, 359 Mo. 402, 222 S.W.2d 64, 69, this court said, on motion for rehearing: "That is exactly what the opinion holds except that we go a step farther and hold that the decision of the Commission [or any other administrative agency] may be judicially questioned not only for fraud or bad faith, but for an arbitrary and unwarranted abuse of discretion." In Bradford v. Phelps County, 357 Mo. 830, 210 S.W.2d 996, 1001, it was held that the county court's discretionary action (as a ministerial body under § 7, Art. VI, Mo.Constitution) in passing upon an item of the county budget might be reviewed to determine whether it was "arbitrary and capricious, without good cause, and in effect in an abuse of discretion, * * *" but not de novo as on appeals from decisions of a judicial or quasi judicial nature. And as there pointed out, § 22, Art. V, Mo.Constitution, and Ch. 536 RSMo 1949, V.A.M.S. are inapplicable. And see, also: State ex rel. Dietrich v. Daues, 315 Mo. 701, 287 S.W. 430; State on Information of Dalton v. Land Clearance for Redevelopment Authority of Kansas City, Mo., 364 Mo. 974, 270 S.W.2d 44, 52. These cases, however, indicate the restricted scope of the review thus available. We have found no abuse of discretion here and no arbitrary exercise of it; rather, we have only found certain misconstructions and misapplications of the statutes.

It is admitted that requests were properly certified on February 11, 1959, for $27,843.20 for police cars, and $17,228.70 for gasoline. These items should have been paid by the City as lawfully within the expense budget. It is alleged in the "Response to Respondents' Return": that the aggregate of the claims, expenses and salary rolls actually certified to the City was $14,126,782.90, being $105,569.97 less than the Board's original estimate, due to a saving, and that the City failed and refused to pay $461,331.42 thereof (thus altering the demand for $640,000 as made in the petition); that $96,743.93 of this amount consisted of the payroll for civilian salaries for the last

half of March 1959; that the balance of $364,587.49 was "for supplies, equipment, contractual services and miscellaneous items"; also, that the City is now obligated to appropriate and disburse in payment of the outstanding salaries and expenses the sum of $461,331.42. These allegations of the balance due for expenses are lacking in detail, and they are not expressly admitted; however, the whole case has been pleaded and heard largely as one upon agreed facts. It is shown by a letter in the record that the City returned to the Board unpaid all vouchers held by the City on March 25, 1959, except payrolls. This situation necessitates a brief review of the status of the pleadings here, and of pleadings generally in mandamus proceedings. There is surprisingly little law on the subject aside from the statutes themselves.

[15–19] Sections 529.010–529.030 prescribe the pleadings in mandamus. For the curious, if any, it is interesting to note that these statutes contain much of the same wording and substance as were in The Statute of Anne (9 Anne C 20, Year 1710) then enacted because proceedings by mandamus "are very dilatory and expensive, whereby great mischiefs have already ensued, and more are likely to ensue, if not timely prevented." The mischief apparently lay in the fact—55 C.J.S. Mandamus §§ 282, 283,—that prior to the statute a return in mandamus was conclusive, and the relator was relegated to an action on the case for a false return. And see our section 529.040, by analogy. Our statutes provide for: (a) a return to the alternative writ (section 529.-010); (b) a pleading to or traverse of "all or any of the material facts contained in" the return (section 529.020); and (c) a reply or other pleading taking issue with such latter pleading (b, above) or a motion (formerly a demurrer § 1534, R.S.1929) directed thereto. (Section 529.030.) These sections prescribe that such pleadings *shall* be filed. Ordinarily, the alternative writ is taken as the first pleading (State ex rel. Consolidated School Dist. No. 1, Mississippi and New

Madrid Counties v. Jones, Banc, 320 Mo. 353, 8 S.W.2d 66, 67), but here the petition has been treated as the alternative writ. Some confusion may have been caused here by the names given to certain pleadings; they are: (1) The Petition for the Writ; (2) The Answer and Return; and, (3) The Response to Respondents' Return. The "Answer and Return" above is the return required by section 529.010; we consider the "Response" to be the pleading to the return required by section 529.020, the name being of no great moment. There was no subsequent pleading by Respondents, the City, as required by section 529.030 and described in (c) above. Under these circumstances we hold that undenied allegations in the so-called "Response" to the return stand admitted. Among these is the allegation that the City refused to pay duly certified claims for supplies, equipment, contractual services and miscellaneous items during the fiscal year in the total amount of $364,587.-49. It is held generally in mandamus proceedings that undenied allegations in a pleading to which a traverse or other pleading is required are deemed admitted and must be accepted as true. State ex rel. Berg v. Thompson, Mo.App., 256 S.W.2d 566 (failure to deny petition); State ex rel. Tate v. Sevier, Banc, 334 Mo. 771, 68 S.W.2d 50 (allegations in return not denied in reply). Here the so-called "Response" is actually the pleading to the return, and a reply (or other pleading) thereto was not only permitted but required by section 529.-030. There is no question of a default, but the allegation of the certified and unpaid expense balance must stand admitted. See specifically: State ex rel. Johnston v. Lutz, 136 Mo. 633, 38 S.W. 323, 325; State ex rel. Penrose Inv. Co. v. McKelvey, Banc, 301 Mo. 1, 256 S.W. 474, 487; State ex rel. White v. Lockett, 54 Mo.App. 202, 205. In Lutz, supra, it was said that the affirmative allegations in the plea by relator to the return "must be taken as confessed." [136 Mo. 633, 38 S.W. 325.] A similar statement was made by Judge White in his dissenting

opinion in 256 S.W. loc. cit. 487, in the McKelvey case, supra, where he said: "The averment in relators' answer to the return that the contemplated factory would *not* be a nuisance per se, may be taken as true, because not denied by respondent. Sections 1983, 1984, R.S.1919." And there the allegation was, as he stated, more or less "promissory and conjectural." Although the foregoing appears in a dissenting opinion, we regard it as a valid statement under the circumstances of that case. If the City desired a more detailed specification of this allegation it should have raised the point by a suitable pleading. Here the ultimate deficiency (as of the year's end) developed after the filing of the petition. It has been held that matters arising pendente lite may be pleaded in defense by the respondent (55 C.J.S. Mandamus § 278, p. 518; State ex rel. Kavanaugh v. Henderson, 350 Mo. 968, 169 S.W.2d 389), or by the relator in his "replication" (55 C.J.S. Mandamus § 284, p. 522.) We must thus take as conceded the fact that certified claims for $364,587.49 for "supplies, equipment, contractual services and miscellaneous items" as made in the normal course of operation, had been refused and rejected during the year in question and remained unpaid. Included therein, necessarily, are the items of $27,843.20 and $17,228.70, previously discussed. It may be unfortunate that this phase of the case has not been better developed, factually, but the whole record indicates that there are no real factual controversies in the case including this matter.

Our peremptory writ will issue against respondents and their successors in office for the sum of $364,587.49 last discussed, and also for all that part of the sum of $96,743.-93 which represents civilian salaries exclusive of "Prison Guards," "Matrons" performing police duties as indicated herein, and "School Crossing Guards." The salaries of these classes will not be included in the writ. The record does not indicate the precise amounts so involved.

All concur.