MENORAH MEDICAL CENTER, a Not-for-Profit Missouri Corporation, the Washington University, a Not-for-Profit Missouri Corporation, and St. Louis University, a Not-for-Profit Missouri Corporation, Plaintiffs-Respondents,

and

John Ashcroft, Attorney General of the State of Missouri, Intervenor-Plaintiff-Respondent,

v.

HEALTH AND EDUCATIONAL FACILITIES AUTHORITY of the State of Missouri, a Body Politic and Corporate, Dr. Gale T. Bartow, Luther G. Bellinger, Dr. Samuel C. Bonney, R. J. [King, R. J.] Massman, III, Lewis H. Wallace and Raphael Zapien, Constituting All of the Members of the Missouri Health and [Educational Facilities Authority] of the State of Missouri, Defendants-Appellants.

No. 61031.

Supreme Court of Missouri, En Banc.

June 29, 1979.

Thomas E. Wack, Armstrong, Teasdale, Kramer & Vaughan, St. Louis, for defendants-appellants.

Lawrence M. Berkowitz, Webb R. Gilmore, Kansas City, Thomas C. Walsh, Michael G. Biggers, St. Louis, for plaintiffs-respondents.

MORGAN, Chief Justice.

Menorah Medical Center, Washington University and St. Louis University, as plaintiffs, sought a declaratory judgment that the Health and Educational Facilities Act (passed in 1975 and now constituting Chapter 360 of the statutory law of this state) did not contravene any provisions of the Missouri and United States Constitutions. Defendants were the Health and Educational Facilities Authority, created by the Act, and the individual members thereof.

Judgment was entered in the Circuit Court of Cole County in favor of plaintiffs. It was predicated obviously upon twenty-six *Findings of Fact* and thirty-seven *Conclusions of Law*, entered of record, which we find delineated and resolved all issues. We affirm.

The uncontroverted purpose of the Act is to establish a mechanism whereby "educational institutions" and "health institutions," as defined therein,[1] may obtain

---

1. Section 360.015 Definitions

(3) "Educational facilities", a structure suitable for use as a dormitory or other housing, dining hall, student union, administration building, academic building, library, laboratory, place in which to conduct research, classroom, place for athletic activities, place in which to provide health care, place in which to house maintenance equipment and supplies, storage place and place in which to locate utilities, as well as other structures or appurtenances related thereto required or useful for the instruction of students in the conducting of research at, or the operation of an educational institution, as defined in sections 360.010 to 360.140, including parking lots, garages, and other buildings or structures essential or convenient for the orderly conduct of such an institution and also including furnishings, equipment, machinery, and appurtenances necessary or convenient for the operation of a particular service or structure in the manner for which its use is intend-

ed, but shall not include such items as books, fuel, supplies, or other items which customarily are deemed to constitute a current operating expense, and shall not include any property used or to be used for sectarian instruction or study or as a place for religious worship or any property used or to be used primarily in connection with any part of a program of a school or department of divinity of any religious denomination.

\* \* \* \* \* \*

(5) "Health facilities", a structure or building suitable for use as a hospital, clinic, nursing home, home for the aged or infirm, place providing health care, laboratory, laundry, nurses, doctors, or interns' residence, place for administrative offices, place in which to conduct research, place in which to house maintenance equipment and supplies, storage place, place in which to locate utilities, auditorium, dining hall, place for food service and preparation, place in which to house fire fighting equipment,

funds for financing capital improvements or to refinance any existing indebtedness under terms, hopefully, more favorable than that in the private market.

The Authority is designated as a "body politic," a "public instrumentality," and an entity "deemed and held to be [in] the performance of an essential public function." § 360.020. Being assigned to the Department of Consumer Affairs, Regulations, and Licensing, the Authority must report annually to the director of that department. § 360.140. Under § 360.025, "The proceedings and actions of the authority shall comply with all statutory requirements respecting the conduct of public business by a public agency." "Educational institution" and "health institution" include any "private association, corporation, or institution not operated for private or corporate profit . . . ." The educational or health facilities which may be financed are broadly defined in § 360.015 but exclude "property used or to be used for sectarian instruction or study or as a place for religious worship or any property used or to be used primarily in connection with any part of a program of a school or department of divinity of any religious denomination." The income and property of the Authority and the income on the bonds it issues are tax-exempt. §§ 360.085 and 360.135. Bonds are not an obligation or liability of the state. § 360.080. The proceeds of the bonds are not revenues of the state. § 360.115. Bonds are payable solely out of the revenues and receipts derived from the leasing or sale by the Authority of the facility involved or as may be designated in a trust indenture authorized by the Authority. § 360.060. Investments which may be made with Authority funds are specified in § 360.120, including permissible investments by pri-

vate fiduciaries in Authority bonds. § 360.-125. The benefits of this arrangement are that the tax-exempt status of the Authority bonds provides greater marketability at lower interest rates than bonds sold through a private issue, and that the interest rate charged by the Authority to the institutions is correspondingly lower than that which would be charged by a private lender.

The Authority may either (1) finance new institution-owned facilities, (2) refinance existing institution-owned facilities, or (3) lease Authority-owned facilities to the private institution. Broad discretion as to the type of financial assistance to be provided is given to the Authority, e. g., loans, purchases of securities, construction and sale, purchase and lease-back, contracts, mortgages, and indentures are all possible alternatives under §§ 360.050–.075 and 360.105. Section 360.100 specifies when the Authority must convey the facilities to the institution involved.

The three plaintiffs in this action, all not-for-profit Missouri corporations, proposed differing forms of financing to the Authority.

Menorah, a short term acute care general hospital governed by a Jewish board of directors, proposed purchase and lease-back financing. Under this proposal, the Authority would use the proceeds of a bond issue to purchase a portion of the hospital facilities and retire the existing debt on it. The Authority would then lease the facilities back to Menorah at a rental amount sufficient to pay the principal and interest due on the bonds. Menorah would be authorized to reacquire title to the leased property directly from the Authority after the bonds are paid in full. Under the lease, Menorah is given the power to alter the

place in which to provide mental and physical health care and dental care, nursing school, medical teaching school, and place in which to house offices; parking lots, garages, and buildings or structures in which to house supporting, services; and all necessary, useful, and related furnishings, equipment, machinery, and appurtenances, including without limitation the acquisition, preparation, and development of all lands necessary or convenient as a site or sites

for any of the foregoing, but shall not include such items as fuel, supplies, or other items which customarily are deemed to constitute a current operating expense, and shall not include any property used or to be used for sectarian instruction or study or as a place for religious worship or any property used or to be used primarily in connection with any part of a program of a school or department of divinity of any religious denomination.

facility as it deems desirable, to extend the lease for up to six five-year periods beyond the term of the bonds at a nominal rent, to terminate the lease and/or purchase the facility prior to the redemption of the bonds by paying a sum sufficient to retire the bonds, to purchase a part of the facility at any time without paying off the bonds, and to grant easements and licenses. Menorah also submitted a proposed trust indenture to the Authority. Under the indenture a private corporate trustee would handle the bond proceeds. The trustee would also receive and disburse the revenues from the projects in order to pay the principal and interest on the Authority bonds. In the event of default, the trustee would be entitled to take over management of the facility, improve, repair, operate, lease, or foreclose the facility or place it in receivership.

Washington University, a nonsectarian institution for higher education proposed a loan agreement for the refinancing of existing graduate student and faculty housing. Under the agreement, the Authority would loan the proceeds of a bond issue to the University, which in turn would use the loan to pay the existing indebtedness on the housing. The loan would be repaid solely from operating funds of the University. The loan agreement was accompanied by a trust indenture similar to that submitted by Menorah.

St. Louis University, a not-for-profit corporation organized for educational purposes, was originally founded as a Jesuit Academy. Today, two-thirds of the board members are of the Catholic faith. St. Louis University proposed a sale agreement. Under the agreement the Authority would use the bond issue proceeds to purchase an audio-visual system. The system would then be sold to the University School of Medicine. Installment payments would be made by the University. The Authority would receive no mortgage or other security for repayment. In the event of default, the Authority would have no right to take pos-

session of the facility. A trust indenture similar to those of Menorah and Washington University accompanied the sale agreement.

The three sets of agreements were approved as to form and content by the Authority in a meeting on May 10, 1978. Counsel for the Authority then identified various legal issues, nearly identical to those raised in this case, including the possibility of personal liability of the Authority members, which led him to advise the Authority not to execute the agreements. The members then passed a resolution refusing to execute the agreements. This suit was then filed.

At the outset, we note that the burden is on appellants to demonstrate that the legislative enactments in question are unconstitutional. In *State ex rel. Farmers' Electric Cooperative, Inc. v. State Environmental Improvement Authority*, 518 S.W.2d 68, 72 (Mo. banc 1975), we recognized the long established principle of constitutional construction that:

> The state constitution, unlike the federal constitution, is not a grant of power, but as to the legislative power, it is only a limitation; and, therefore, except for the restrictions imposed by the state constitution, the power of the state legislature is unlimited and practically absolute. *Kansas City v. Fishman*, 362 Mo. 352, 241 S.W.2d 377 (1951).

See also *State ex rel. Jardon v. Industrial Development Authority*, 570 S.W.2d 666, 673 (Mo. banc 1977); and, *Americans United v. Rogers*, 538 S.W.2d 711, 716 (Mo. banc 1976).

### I.

Appellants contend that Chapter 360 authorizes the lending of public credit and grant of public money by the General Assembly in violation of Article III,[2] §§ 38(a), 39(1) and 39(2), in that the state's name and credit are used on the Authority's bonds, and thus default on the bonds could impair

---

2. Unless otherwise noted, Articles referred to herein are those of the 1945 Constitution of Missouri.

the state's own credit, and in that no public purpose is involved in the issuance of these bonds to private institutions.

Article III, § 39 of the Missouri Constitution provides, in part, that:

> The general assembly shall not have the power: (1) To give or lend or to authorize the giving or the lending of the credit of the state in aid or to any person, association, municipal or other corporation;
>
> (2) To pledge the credit of the state for the payment of the liabilities, present or prospective, of any individual, association, municipal or other corporation; . . .

It is argued that the credit of the state is being lent in two ways: First, the title of the Authority, "the Health and Education Facilities Authority *of the State of Missouri,*" (§ 360.020) indicates that the state is involved and stands behind the Authority; second, any default by the Authority might affect adversely the state's credit, even if the state is not required to stand behind the Authority directly, since the Authority is a public instrumentality by virtue of the fact that it uses the name of the state.

These arguments are without merit. The Authority is not the state and the credit of the state is not being lent. The Authority is established as a "body politic and corporate" which is a "public instrumentality." § 360.020. Similar bodies have been adjudged as "separate entities" from the state. See *State ex rel. Farmers' Electric Cooperative, Inc.,* supra, at 73 (State Environmental Improvement Authority); *Christenson v. State Highway Commission,* 40 S.W.2d 615, 616 (Mo.1931) (State Highway Commission, as a separate entity for purposes of jurisdiction over appeals). In *State ex rel. Jardon,* supra, at 676, we declined again the opportunity to extend the definition of "lending of credit" to the mere use of the name of a city or county. In the present case we likewise decline the opportunity to extend said definition to the mere use of the name of the state.

Even if the Authority were considered a state entity, the credit which it lends is not that of the state. As respondents argue, the Act establishing the Authority makes it clear that the bonds issued by that Authority are payable solely from the revenues and receipts generated by the sale or lease of the facilities involved, and not from taxation, and thus the bonds do not constitute a debt or liability of the state or any political subdivision thereof. §§ 360.060, 360.080. This limitation on revenues from which the bonds are payable must be stated on the face of the bonds. § 360.080. Under such circumstances, it has been held by this court that the credit lent is that of the Authority, not that of the state of Missouri. *State ex rel. Farmers' Electric Cooperative, Inc.,* supra. See also Opinion of the Justices, 236 N.E.2d 523, 527 (Mass.1968). We thus find no violation of Article III, § 39. The same holding has been reached under Article VI, §§ 23–25, with respect to the lending of credit by counties, cities or other political corporations or subdivisions of the state. *State ex rel. Mitchell v. City of Sikeston,* 555 S.W.2d 281, 290–91 (Mo. banc 1977); *State ex rel. Jardon,* supra.

At the heart of appellants' constitutional challenge concerning Article III, § 38(a) is the public purpose doctrine. On its face, § 38(a) prohibits the granting of public money or lending of public credit to any private entity without regard to the purpose of the grant or loan. A proviso has been judicially grafted onto this and similar sections, however, which permits grants of public money to private entities if the grant is for a public purpose.

In *Americans United* at 719–20 (Mo. banc 1976), one of the issues presented was the question of whether the statutory program of tuition grants to students at various approved public and private colleges violated § 38(a). A majority of this court held that § 38(a) was not violated because of the existence of a public purpose of aiding higher education.

The statute creating the Authority in the present case provides that:

> . . . the exercise by the authority of the powers conferred by § 360.010 to 360.-140 shall be deemed and held to be the performance of an essential public function. § 360.020.

This court stated in *State ex rel. Farmers' Electric Cooperative, Inc.*, supra, at 74, that:

> . . . determination of what constitutes a public purpose is primarily for the legislative department and it will not be overturned unless found to be arbitrary and unreasonable.

Debates on Article III, § 38, at the 1945 Constitutional Convention, indicate the belief that Missouri's constitution should be flexible and progressive enough to allow state public funds to be committed to new needs and purposes. See Eleven Debates of Missouri Constitution, 1945, pp. 3208–3212. This philosophy was reiterated in *State ex rel. Jardon*, supra, at 675, when we noted that,

> The consensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classified as involving public purpose.

The purposes at issue here meet the public purpose test. The encouragement of higher education was explicitly recognized as a public purpose in *Americans United*, supra, at 719. In *Ellis v. City of Grand Rapids*, 257 F.Supp. 564–573, 574 (W.D. Mich.1966), the court said that:

> All have recognized that hospital care provided by the public, private, and private sectarian non-profit institutions is a public use clothed with the overriding public interest, and courts have sustained the Executive and Legislative branches of our government in giving aid to such institutions.

It hardly can be argued, within the context of the Missouri Department of Mental Health and Division of Health within the Department of Social Services, that it is arbitrary and unreasonable to designate the provision of health care as a public purpose.

This court has attached the same public purpose provision to similar provisions of Article VI, §§ 23 and 25. See *State ex rel. Jardon*, supra, at 676; *State ex rel. Mitchell*, supra, at 291; *State ex rel. Farmers' Electric Cooperative, Inc.*, supra, at 74–75. In view of the past interpretation given to Article III, § 38(a) and Article VI, §§ 23 and 25, it would be difficult at this time to invoke a more strict or literal construction of these provisions. We thus find that Chapter 360 is upheld under constitutional challenges relating to Article III, §§ 38(a), 39(1), and 39(2).

## II.

■ Appellants argue that the Act violates Article VI, §§ 23 and 25, which prohibit a political corporation or subdivision of the state from lending its credit or granting public money or things of value to private persons because tax exemptions on the bonds allow participating institutions to borrow at rates less than those charged in the commercial market and because tax revenues are lost by special tax exemptions on the bond income.

The public purpose doctrine again applies. This court has held in similar situations that such an exception or qualification to the prohibition does exist, *State ex rel. Jardon*, supra; *State ex rel. Mitchell*, supra; *State ex rel. Farmers Electric Cooperative, Inc.*, supra. In *State ex rel. Jardon*, supra, the legislature authorized political subdivisions to approve separate corporations for the purpose of developing industrial facilities to be leased or sold to private entities. Such corporations were empowered to finance the facilities by issuing tax exempt bonds. The bonds were payable solely out of revenue generated by the facilities developed. The legislation was held not to violate §§ 23 and 25 because it was enacted for a public purpose. In *State ex rel. Mitchell*, supra, the output of a new power generating plant was to be shared by several municipalities and a private electric cooperative. The City of Sikeston proposed to build and own the plant, financing it with revenues obtained from the sale of tax-exempt bonds payable solely out of revenues generated from the plant. Other municipalities and the private cooperative proposed to enter into power sales contracts with Sikeston. This financing arrangement was upheld (against a claim that the bond issue and sales contracts constituted a lending of credit to the private cooperative in violation of §§ 23 and 25) because the arrangement was for a public purpose. In *State ex rel. Farmers' Elec-*

*tric Cooperative, Inc.*, supra, the legislature created a "body corporate and politic" essentially similar to the Authority in the present case. Its purpose was to acquire and construct pollution abatement facilities which were to be leased or sold to private industry. The facilities were financed by the issuance of tax exempt bonds payable solely from revenues generated by the facilities and for which the state was in no way liable. The Authority's activities were upheld, against a challenge based on §§ 23 and 25, because they were for a public purpose. In view of these cases, it is evident that loans or expenditures of bond issue revenues by public bodies for public purposes do not violate Article VI, §§ 23 and 25.

### III.

■ Appellants argue that the Act permits the expenditure of public funds for private purposes in violation of Article X, §§ 1 and 3, because the state's own funds could be subject to claims by bondholders in the event of certain acts creating legal liability on the part of the Authority and its members.

The same argument was presented in *State ex rel. Farmers' Electric Cooperative,* supra at 75, and rejected. The challenged sections relate to "tax revenue," and taxing powers. As was the case in *State ex rel. Farmers' Electric Cooperative, Inc.*, the Authority does not exercise any taxing power.

### IV.

■ Appellants argue that the Act violates Article III, § 37, which limits state liabilities and bond issues, because the term "liability" is broader than a mere monetary debt and the state's own funds could be subject to claims by bondholders in the event of certain acts creating legal liability on the part of the Authority and its members.

Article III, § 37, provides,

The general assembly shall have no power to contract or authorize the contracting of ány liability of the state, or to issue bonds therefor, . . .

with exceptions not here pertinent.

Appellants argue that the term "liability" has a broader meaning than merely a public debt, citing *Board of Public Buildings v.*

*Crowe,* 363 S.W.2d 598 (Mo.1962), in that some future circumstance may arise in which the state will be held liable on the bonds. In circumstances similar to those of the present case, *Board of Public Buildings* held that "liability" means "a contractual indebtedness, present or future, absolute or contingent, which will or may be liquidated by general taxation." *Board of Public Buildings,* supra at 605. However, *Board of Public Buildings* went on to hold that authorization of the Board to issue revenue bonds for construction of state buildings did not create a liability within the meaning of Article III, § 37, where the bonds were to be paid solely out of revenues generated by the buildings to be constructed, *id.* The holding of this court in *State ex rel. Farmers' Electric Cooperative, Inc.*, supra at 75, is to the same effect that bonds issued by a separate entity, to be paid solely out of revenues generated by the facilities financed, do not create liabilities of the state.

§ 360.080 specifies that the bonds in the present case "shall not be deemed to constitute a debt or liability of the state or any political subdivision thereof . . . ."

### V.

■ Appellants argue that the Act violates Article III, § 40(28), and the Equal Protection requirement of the United States and Missouri Constitutions by granting special rights, privileges, and immunities only to certain institutions because the exclusion of for-profit institutions from the benefits of the Act is arbitrary and without rational basis.

The Equal Protection Clause of the United States Constitution, Amend. 14 § 1, is too well known to require recitation. Appellants do not specify which clause of the Missouri Constitution they intend by the term "Equal Protection." Presumably, they intend Article I, § 2, which provides, in relevant part:

that all persons are created equal and are entitled to equal rights and opportunities under the law; . . .

Article III, § 40(28) provides,

Section 40. The general assembly shall not pass any local or special law:

.　　　.　　　.　　　.　　　.

(28) granting to any corporation, association or individual any special or exclusive right, privilege or immunity, . . .

Appellants argue generally that it is irrational to grant a special privilege and tax exemption only to not-for-profit health and education institutions when for-profit institutions provide the same services and functions and would be equally able to increase their services and lower their costs if the privilege and exemption were available to them. Appellants cite no cases in support of their proposition.

*State ex rel. Atkinson v. Planned Ind. Expansion Auth.*, 517 S.W.2d 36, 43 (Mo. banc 1975), illustrates the criteria by which it is determined whether a law is local or special. The classification must be reasonable, not arbitrary, and the privilege created by the law must be available to all entities within the classification, *id.* at 43. This test is met in the present case.

Although both profit and not-for-profit institutions have the purpose of providing health care or education, the differences in structure and organization between profit and not-for-profit institutions and the possibility of differences in institution-client relationships form a reasonable basis for legislative distinction.

The reasonableness of the distinction between profit and not-for-profit institutions in Chapter 360 is supported by noting that similar distinctions are common in our law, *e. g., Community Memorial Hospital v. City of Moberly*, 422 S.W.2d 290 (Mo.1967); Ch. 355 RSMo 1969 (establishing separate Not-for-Profit Corporation Law); Mo.Const. Art. X, §§ 6, 6(b) (permitting tax exemptions for certain not-for-profit institutions and property).

As to the second criteria, there is no dispute that the benefits of Chapter 360 are available for all not-for-profit institutions which otherwise meet the criteria in the statute.

There is no contention that the classification created is invidious or that the excluded for-profit institutions are denied any fundamental rights. Therefore, the classi-fication may be struck down only if the challengers show that it is unreasonable, *e. g., City of St. Louis v. Liberman*, 547 S.W.2d 452, 458 (Mo. banc 1977). The appellant has not shown the distinction in Chapter 360 between for-profit and not-for-profit institutions to be unreasonable.

### VI.

■ Appellants contend that the tax exemptions for Authority property under §§ 360.085 and 360.135 fall outside the presumptions set forth in Article X, §§ 6 and 15, because the Authority is not a "political subdivision" within the meaning of those constitutional provisions, and the exceptions provided therein do not apply to Authority property.

§§ 360.085 and 360.135 provide, in part, that all property owned, acquired or used by the Authority is to be exempt from taxation. The ability of the legislature to grant tax exemptions is limited by Article X, §§ 6 and 15 of the Missouri Constitution.

We agree that the Authority is not a "political subdivision" within the definition of Article X, § 15, since the Authority does not have the power to tax. The validity of the tax exemption granted by §§ 360.085 and 360.135 therefore depends on whether the property of the Authority falls within the permissible exemptions of Article X, § 6, *i. e.*, whether the property is both ". . . not held for private or corporate profit . . ." and ". . . used exclusively for religious worship, for schools and colleges, for purposes purely charitable, or for agricultural and horticultural societies . . . ."

Under the statutory definitions of educational institutions eligible to receive financing from the Authority and educational facilities for which financing assistance may be received, § 360.015(3), (4), the Authority's property used by educational institutions is property "used exclusively . . . for schools and colleges . . . ."

However, there is no blanket exemption for property used exclusively for health institutions similar to the one for property used for schools and colleges. The property of not-for-profit health institutions may be

exempt only if "used exclusively . . . for purposes purely charitable . . . ."

In *Salvation Army v. Hoehn*, 354 Mo. 107, 188 S.W.2d 826, 830 (banc 1945), the court reiterated with approval the definition of a charity as set forth in *In re Rahn's Estate*, 316 Mo. 492, 511, 291 S.W. 120, 128, 51 A.L.R. 877 (1927), stating that:

. . . it is a gift, to be applied consistently with existing laws, for the benefit of an indefinite number of persons, either by bringing their hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves for life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government. * * * A charity may restrict its admissions to a class of humanity, and still be public; it may be for the blind, the mute, those suffering under special diseases, for the aged, for infants, for women, for men, for different callings or trades by which humanity earns its bread, and as long as the classification is determined by some distinction which involuntarily affects or may affect any of the whole people, although only a small number may be directly benefited, it is public. * * *

As noted in *Franciscan Tertiary Prov. of Mo., Inc. v. State Tax Comm'n*, 566 S.W.2d 213, 221 (Mo. banc 1978), the rationale of *Salvation Army* has been used in granting hospitals charitable exemptions from ad valorem taxation. *Alexian Brothers Hospital v. Powers*, 74 Mo. 476, aff'g 10 Mo.App. 263 (1881); *Community Memorial Hospital v. City of Moberly*, 422 S.W.2d 290 (Mo.1967); *Jackson County v. State Tax Commission*, 521 S.W.2d 378 (Mo. banc 1975).

In *Jackson County* at 283, the court concluded that:

[P]roviding of hospital facilities for the sick in a non-profit manner rises to a charitable purpose tax-exempt status if the same is available to both rich and poor.

Chapter 360, and the institutions in question in the present case, fall within the exemptions set forth in Article X, § 6.

## VII.

■ Appellants argue that the Act violates Article III, § 36, and Article IV, § 15, because it fails to provide that the moneys received by the Authority shall go into the state treasury and it allows for expenditure of such moneys without appropriation by the legislature.

Article III, § 36, provides in relevant part that:

All revenue collected and money received by the state shall go into the treasury and the general assembly shall have no power to divert the same or to permit the withdrawal of money from the treasury, except in pursuance of appropriations made by law. . . .

On its face, Article III, § 36, applies only to "revenue collected and money received *by the state*." (Emphasis added) As indicated earlier, the Authority, though it is a public body and instrumentality, is an entity apart from the state. Thus, even if its funds are public funds, they may not be state funds subject to this provision. See *Mallory v. Barrera*, 544 S.W.2d 556 (Mo. banc 1976); *State ex rel. Farmers' Electric Cooperative, Inc.*, supra at 76; *Board of Public Buildings*, supra; *State ex rel. Thompson v. Board of Regents for Northeast Missouri State Teachers' College*, 305 Mo. 57, 264 S.W. 698 (Mo. banc 1924).

Article III, § 36 is not violated because the Authority is a separate entity from the state and does not raise or receive its funds in connection with any sovereign powers of the state. Thus, no state money or revenue is involved.

## VIII.

■ Appellants contend that the Act violates Article III, § 23, because the statute contains several extraneous provisions not clearly expressed in its title.

Article III, § 23, provides:

No bill shall contain more than one subject which shall be clearly expressed in its title . . .

with certain exceptions not here relevant. The sections of Chapter 360 which appel-

lants claim violate Article III, § 23, are: § 360.125, which authorizes investment in the Authority's bonds by banks, executors and other fiduciaries; § 360.130, directing that Authority-financed facilities not be considered public facilities for the purpose of laws regulating public facilities; and the Act, generally, in that it provides benefits to both health and educational institutions. No authority is cited in support of these propositions.

In *State ex rel. Jardon*, supra, where similar contentions were raised and rejected, the court stated that:

Clearly, the controlling test is whether or not all of the provisions of the statute fairly relate to the same subject, have a natural connection therewith or are the incidents or the means to accomplish its purpose, *id.*

The subject matter interrelationship is apparent in Chapter 360. All provisions relate to the establishment of the Health and Educational Facilities Authority and implementation of its projects. In *Fort Sanders Presbyterian Hospital v. Health and Educational Facilities Board*, 224 Tenn. 240, 453 S.W.2d 771, 773 (1970), it was held that:

It is our view that the Act does not embrace two subjects merely because both health and educational facilities are dealt with. Rather, the subject of the Act is the creation of public corporations, with implementation of improvement of health and education being descriptive of the objectives of the corporations, *id.*

We conclude that all of the sections of Chapter 360, pointed to by appellants, do fairly relate to the same subject as it is expressed in the Act's title:

An Act relating to the creation of a health and educational facilities authority for the state of Missouri, and to prescribe its powers and duties. S.C.S.H.B. 70, 78th Gen.Ass. 1st Session.

## IX.

■ Appellants maintain that chapter 360 constitutes unlawful delegation of legislative authority in that adequate standards regarding financing are not set forth in the statute, in that the Authority can subdelegate decisions to participating institutions and in that delegation to private indenture trustees is apparent and is unlawful.

At the outset, we note that Chapter 360 should be construed as an integrated unit, with each section thereof viewed in pari materia with other sections of the chapter. To take certain sections of the chapter out of context does not do justice to legislative intent or legitimate delegation restrictions. § 360.045.6 (Powers of authority) incorporates by reference the whole of Chapter 360. To have repeated in each section particulars found in other sections of the chapter would have been to add unnecessary redundancy.

The Act successfully meets the current Missouri test as set forth in *ABC Security Service, Inc. v. Miller*, 514 S.W.2d 521 (Mo. 1974). Therein, at 524, we stated that:

An ordinance or a statute which vests discretion in administrative officials must, generally stated, include standards for their guidance in order to be constitutional. *Behnke v. City of Moberly*, 243 S.W.2d 549 (Mo.App.1951); *Clay v. City of St. Louis*, 495 S.W.2d 672 (Mo.App. 1973).

But the *ABC* case, at 524, continued by emphasizing that:

[T]he tendency is toward greater liberality in permitting grants of discretion, *Milgram Food Stores, Inc. v. Ketchum*, 384 S.W.2d 510 (Mo.1964), and the validity of any grant of discretion will depend largely upon the nature of the activity with respect to which it is exercised. *Ex parte Williams*, 345 Mo. 1121, 139 S.W.2d 485 (1940).

Three general exceptions to the requirement of standards in statutes delegating decisions to administrative agencies were set forth in the *ABC* case at 524–25:

(1) [W]here the ordinance or statute deals with situations which require the vesting of some discretion in public officials, and where it is difficult or impracticable to lay down a definite, comprehen-

sive rule; (2) where the discretion relates to the administration of a police regulation and is necessary to protect the public morals, health, safety and general welfare; (3) where personal fitness is a factor to be taken into consideration. *Milgram Food Stores, Inc. v. Ketchum,* supra, 384 S.W.2d at p. 514; *State ex rel. Priest v. Gunn,* 326 S.W.2d 314 (Mo.banc 1959); *Ex parte Williams,* 345 Mo. 1121, 139 S.W.2d 485 (1940) supra; *State ex rel. Mackey v. Hyde,* 315 Mo. 681, 286 S.W. 363 (banc 1926); *Clay v. City of St. Louis,* supra, 495 S.W.2d at p. 675–676; 51 Am. Jur.2d Licenses and Permits § 53.

§ 360.045 falls within the first category. In order to make determinations as to locations and leasing of public educational and health buildings, some discretion in public officials is necessary to insure that the building, its design, location and use is appropriate for the individual institution's needs and is adapted to those needs in a functional manner. The administrative authority, after consultation with the local institution in question, would be much better equipped to evaluate factors and make a building by building or lease by lease or loan by loan determination of these specific needs than would be the legislature. We must view the grant of discretion in § 360.-045 pragmatically.

Modern regulatory agencies must often determine factual questions which could not have been anticipated at the time of the legislative enactment. Missouri courts have recognized the need for rules which provide for the needed flexibility to adapt to the increasing complexities of modern society. The liberalizing trend in interpreting statutes which are faced with nondelegation challenges has been recognized and adopted by Missouri courts. In *Mutual Auto Parks,*

*Inc. v. Kansas City,* 537 S.W.2d 820, 823 (Mo.App.1976), the court held that:

The modern tendency of the courts is toward greater liberality in permitting grants of discretion to administrative officials in order to facilitate the administration of the laws as the complexity of governmental and economic conditions increases. *Milgram Food Stores, Inc. v. Ketchum,* 384 S.W.2d 510 (Mo.1964), cert. den. 382 U.S. 801, 86 S.Ct. 10, 15 L.Ed.2d 55 (1965), quoting from *Pressman v. Barnes,* 209 Md. 544, 121 A.2d 816 (1956). The *Milgram* court pointed out that the practice is similar in Missouri, citing *Ex Parte Williams,* 345 Mo. 1121, 139 S.W.2d 485 (1940), cert. den. in *Williams v. Golden,* 311 U.S. 675, 61 S.Ct. 42, 85 L.Ed. 434 (1940).

The widely quoted scholar, Professor Davis, noted:

That Congress may and does lawfully delegate legislative power is more obvious than ever. Not many lawyers assert to federal courts during the 1970s that Congress may not delegate, or even that standards must accompany a delegation.

Davis, *Administrative Law of the Seventies, Supplementing Administrative Law Treatise, 1976, p. 29.*

Davis goes on to recognize that, although the rule has differed in the past between state and federal courts, it is now the trend even among state courts to abandon specific standards requirements.

As early as *Board of Public Buildings,* supra, we realized that the viability of a strict nondelegation doctrine was waining in other states. Statutes granting building commissions authority to build, lease and construct buildings were being upheld against nondelegation charges.[3]

---

**3.** *Book v. State Office Bldg. Com'n,* 238 Ind. 120, 149 N.E.2d 273, 291, 297–98 (1958), where the empowering of a building commission to select a site for proposed buildings was upheld against an improper delegation charge, and the entire act did not fall when part of the Act was invalid; *Preston v. Clements,* 313 Ky. 479, 232 S.W.2d 85, 88 (App.1950), where delegation of ministerial responsibilities of ascertaining building and housing needs was upheld, and

the presumption that administrative bodies will act within the limits of their authority was affirmed; *McArthur v. Smallwood,* 225 Ark. 328, 281 S.W.2d 428, 431 (1955), where authorizing the Arkansas Building Commission to construct a justice building and to finance the construction thereof was a permissible delegation of lawmaking power; *Holmes v. Cheney,* 234 Ark. 503, 352 S.W.2d 943, 946 (1962), wherein a building commission's performance

In *Barry and Barry, Inc. v. State Department of Motor Vehicles*, 81 Wash.2d 155, 500 P.2d 540, 543, 544 (banc 1972), the Washington Supreme Court stated that delegated power did not have to be accompanied by specific standards. The court reasoned that strict interpretation of the standard rule frustrated the efficient operation of government when it held that:

[A] strictly construed standards doctrine is logically unsound and legally meaningless. The needs and demands of modern government require the delegation of legislative power without *specific* guiding standards. . . .

The non-delegation doctrine can and should be altered to turn it into an effective and useful judicial tool. Its purpose should no longer be either to prevent delegation of legislative power or to require meaningful statutory standards; its purpose should be the much deeper one of protecting against unnecessary and uncontrolled discretionary power. . . . The focus of judicial inquiries thus should shift from statutory standards to administrative safeguards.

\* \* \* \* \* \*

[T]hese provisions of the Washington State and United States constitutions mean only that legislative power is delegated *initially and fundamentally* to the legislative bodies. We believe that one of the legislative powers granted by these provisions is the power to determine the amount of discretion an administrative agency should exercise in carrying out the duties granted to it by the legislature. To construe these provisions as confining the exercise of legislative power to the legislative bodies, would be to read them as limitations of power rather than as grants of power. We may assume that if

the framers had intended to so limit the power of the legislative bodies, they would have done so expressly, rather than by implication.

*Barry* at 544.

The constitutionality of legislative enactments in Missouri has always been presumed, and except for limitations imposed by the state constitution, the power of the legislature is practically absolute *Americans United*, supra, *cert. denied* 429 U.S. 1029, 97 S.Ct. 653, 50 L.Ed.2d 632; *State ex rel. Farmers' Electric ·Cooperative, Inc.*, supra. The case of *Milgram Food Stores, Inc. v. Ketchum*, 384 S.W.2d 510, 514 (Mo.1964), *cert. denied* 382 U.S. 801, 86 S.Ct. 10, 15 L.Ed.2d 55, went on to recognize that even in the face of an improper delegation charge, if two constructions of a statute are possible, the one which would uphold its validity should be adopted.

The Authority can understand clearly that it is given the power "To determine location and construction of any facility" under this chapter and to make repairs or to designate participating institutions to assist in that determination. § 360.045(6). There is nothing unclear or ambiguous about this grant of authority. The same can be said for § 360.045(7), pertaining to leases, and § 360.045(13) pertaining to loans.

The private indenture trustee delegation challenge is equally without merit. In *State ex rel. Jardon*, supra at 678, this issue was met when the court stated that:

We believe that the rights granted to the private trustee in the instant case do not involve any governmental powers. They are merely bestowed upon the trustee for the purpose of protecting a bondholder's expectation of receiving principal and interest payments. As such, they do not

---

of ministerial acts did not constitute an unconstitutional delegation of legislative power to the commission. The act dealt with the purchase of bonds and construction of buildings, among other things; *Loomis v. Keehn*, 400 Ill. 337, 80 N.E.2d 368, 372 (1948), where the Armory Board Act's provisions permitting that public corporation to build armories, lease them to the state, and pay loans necessary for construction was held to ministerial and a lawful delegation

of authority; *Kelley v. Earle*, 325 Pa. 337, 190 A. 140, 147 (1937), where the power of a state authority to arrange for the construction of designated types of public improvements was upheld; *Texas National Guard Armory Bd. v. McCraw, Atty. Gen.*, 132 Tex. 613, 126 S.W.2d 627, 636 (1939), wherein university board of regents was permissibly empowered to make contracts and to issue bonds without violating the anti-delegation rule.

constitute an unlawful delegation of power.

The Missouri Health and Educational Facilities Authority Act creates an essential mechanism for construction and acquisition of health facilities. Provisions being challenged in Chapter 360 are substantially similar to the model health institution act[4] adopted by the Council of State Governments, 1976 Suggested State Legislation, Vol. XXXII, pp. 43, 47–49 (August 1975). The model act has as its stated purpose:

> To provide a measure of assistance and alternative methods to enable health institutions to refund or refinance outstanding indebtedness incurred for health facilities and to provide additional health facilities and structures by creating a state authority to lend money to health institutions and by authorizing the state authority to acquire, construct, and repair properties for use as health facilities.

*Id.*, at 43.

In *Board of County Commissioners v. Idaho Health Facilities Authority*, 96 Idaho 498, 531 P.2d 588, 598 (1975), the Idaho Supreme Court approved delegation found in 7A Idaho Code 39–1447, an act similar to Chapter 360, because the authority was merely given "the power to determine facts necessary to carry out its functions, to regulate itself in carrying out the duties given to it by law, and to enter into agreements authorized by law."

Establishment of boards or authorities, endowed with the power to construct or lease buildings, is not a new nor particularly unique concept. The endowment of a board with such authority is hardly foreign to Missouri.

We recognized in *Board of Public Buildings*, supra, that legislation setting up a board of public buildings and authorizing it to construct buildings for rental to state agencies did not constitute an improper delegation of legislative powers and did not violate separation of powers. Therein, at 606, we stated:

Our legislation sufficiently declares and defines the conditions under which the Board may act, its powers, and the legislative will; the detailed determinations may properly rest in the Board's discretion.

See also, *Brown-Forman Distillers Corp. v. Stewart*, 520 S.W.2d 1, 5–6 (Mo.1975).

To deny the Health and Educational Facilities Authority the discretion it must have to make vital factual determinations of the needs of our institutions on an institution-by-institution basis and to lease, construct, or refinance facilities based upon the specific needs of a given institution would be to take a giant step backwards away from the modern realities of administrative law.

## X.

Appellants offer two church-state challenges to the application of Chapter 360. First, they contend that the federal establishment clause of the First Amendment is violated in that use of bond proceeds by Menorah Medical Center and St. Louis University constitutes excessive entanglement with religion. Second, the appellants contend the Menorah lease agreement and St. Louis University sale agreement with the Authority violate church-state provisions of the Missouri Constitution because (what appellants classify as) "public funds" are being used to aid sectarian purposes.

In *Hunt v. McNair*, 413 U.S. 734, 93 S.Ct. 2868, 37 L.Ed.2d 923 (1973), the U.S. Supreme Court applied the three-prong test it had established in *Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971), to determine whether or not constitutional restrictions on the establishment of religion are violated. Under this test we generally, must make the following determinations: (1) whether the statute has a secular legislative purpose, (2) whether its principal or primary effect either advances or inhibits religion, and (3) whether the

---

4. The Wisconsin statute, effective June 19, 1974, serves as the source of the model act. W.S.A. § 231, et seq. See in particular W.S.A. § 231.03(5), (13), (16), enumerating power in question in the present case.

statute fosters an excessive entanglement with religion. This test also has been recognized by Missouri courts. *Americans United*, supra.

However, the "purpose" and "effect" of the Health and Educational Facilities Act are not challenged by appellants. They only quarrel with the excessive entanglement prong of the test.

At the outset, we note that entanglement itself is not prohibited. Only excessive entanglement is forbidden. Four overall observations lead us to conclude that no excessive entanglement exists in the present case: (1) the state is not directly involved in expending or in supervising expenditure of funds, (2) funds are being used to promote a public purpose, not a sectarian one, (3) the funds involved are being used in a neutral fashion, for the construction of physical facilities, and (4) facilities for the higher education level, as opposed to elementary or secondary level, are in issue.

We reiterate our earlier conclusion that the state is not the financing mechanism. Financing is through contractual arrangements between the independent authority and a given educational or health institution and bondholders. The Authority does not become a subdivision of the state simply because it deals with tax exempt bonds and there is no impairment of state credit involved. Thus, the state is not involved in establishing religion.

## XI.

■ We reject the appellants' contention that the proposed financing agreements in question exceed the expressed or implied rights of the Authority. § 360.045, which enumerates the Authority's powers, begins by stating that:

The authority shall have the following powers together with all powers incidental thereto or necessary for the performance thereof . . .

including, as stated in § 360.045(16), the right:

[t]o do all things necessary and convenient to carry out the purposes of [the Act].

With regard to the bonds and financing arrangements, further flexibility is set forth in § 360.075.

The appellants have not demonstrated that any of the financing arrangements are in conflict with any specific provisions of the Act or are contrary to the Authority's goals of promoting health and higher education.

## XII.

■ We find no violation of § 15.10 of the Omnibus State Reorganization Act of 1974 by Menorah's proposed lease and St. Louis University's proposed agreement of sale, as the Authority is a separate entity.

## XIII.

■ Chapter 360 does not prohibit payment of bonds out of proceeds derived from a loan agreement. Sections 360.060 and 360.080 should be construed in such a manner as to avoid conflict if possible. Section 360.060 provides for payment of bonds from leasing or sale agreements, while § 360.080 provides that:

[E]ach bond issued by the authority pursuant to the provisions of §§ 360.010 to 360.140 shall be payable solely from the funds pledged for its payment in accordance with the resolution authorizing its issuance or any trust indenture or mortgage or deed of trust executed as security therefor.

We do not believe the legislature intended to create a loan agreement procedure without permitting a logical means (consistent with other repayment mechanisms of the Act) through which repayment was possible. In § 360.080 there is adequate authorization for repaying bonds from loan agreement proceeds.

## XIV.

■ Contrary to the appellants' contentions, we find the sales agreement between St. Louis University and the Authority and the payment provisions associated therewith to be adequate under the guidelines of § 360.100 and Chapter 360 as a whole.

We, therefore, agree with the lower court's rulings on all counts and affirm the judgment predicated thereon.

BARDGETT and SEILER, JJ., concur.

WELBORN, Special Judge, concurs in result.

DONNELLY, J., dissents in separate dissenting opinion filed.

RENDLEN and WELLIVER, JJ., dissent and concur in separate dissenting opinion of DONNELLY, J.

SIMEONE, J., not sitting.

DONNELLY, Judge, dissenting.

The question in this case is whether Chapter 360, RSMo Supp.1975, the Missouri Health and Educational Facilities Authority Act, is constitutional. I would hold that it is not because of its failure to delimit the wide discretionary powers given the Authority.

The Authority is empowered to engage in three types of financial assistance—leasing of Authority-owned facilities, making loans to finance new institution-owned facilities, and making loans for refinancing existing institution-owned facilities, § 360.045(6), (7), (13), (14). The only limitation on the exercise of these powers, and guidance as to which of the eligible Missouri institutions should be assisted, is found in § 360.045(14), pertaining solely to the refinancing of existing institution-owned facilities. Section 360.045(14) sets standards of financial hardship, reduced cost of care or education, and savings to third parties. Adherence by the Authority to these standards may be objectively determined and enforced by any party or body having cause to do so, whether it be the General Assembly, applicant institutions, reviewing courts, or the public. The Authority is granted broad, uncontrolled discretion as to the exercise of its power to lease Authority-owned facilities and to make loans to finance new institution-owned facilities.

Such grants of discretion to administrative authorities raise two constitutional concerns, that of separation of powers, Mo. Const.Art. II, § 1, and Art. III, § 1, and of due process, Mo.Const.Art. I, § 10. These provisions are not unrelated *McGautha v. California*, 402 U.S. 183, 272, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) (Brennan, J., dissenting). Both are concerned with the prevention of arbitrary exercise of power. As Professor Raoul Berger has had cause to note, quoting Charles McIlwain:

" '[T]he two fundamental correlative elements of constitutionalism for which all lovers of liberty must yet fight are the legal limits to arbitrary power and a complete political responsibility of government to the governed.' " Berger, *The Constitution and the Rule of Law*, 1 West.New Eng.L.R. 261, 274 (1978).

Article II, § 1 of the Missouri Constitution, reads as follows:

"The powers of government shall be divided into three distinct departments— the legislative, executive and judicial— each of which shall be confided to a separate magistry, and no person, or collection of persons, charged with the exercise of powers properly belonging to one of those departments, shall exercise any power properly belonging to either of the others, except in the instances in this constitution expressly directed or permitted."

Article III, § 1 of the Missouri Constitution, reads as follows:

"The legislative power shall be vested in a senate and house of representatives to be styled 'The General Assembly of the State of Missouri.' "

These provisions historically have been implemented by the "delegation doctrine." This Court today takes another step along the path of reading all meaning out of this doctrine. I acknowledge that the opinion in *ABC Security Service, Inc. v. Miller*, 514 S.W.2d 521, 524 (Mo.1974) declares that "a statute which vests discretion in administrative officials must, generally stated, include standards for their guidance in order to be constitutional." However, I would overrule *ABC*. The general rule it purports to declare is a fiction. The exceptions it

creates are larger than the rule itself. I can only hope that some future Court will reexamine and question the wisdom of proceeding along this path.

I believe that the delegation doctrine properly requires that statutes granting discretionary power to administrators be declared unconstitutional if they do not "set standards sufficiently precise to ensure that the relevant agency receives clear signals regarding the policy it is expected to carry out." Wright, *Beyond Discretionary Justice*, 81 Yale L.J. 575, 581 (1972).

Various justifications have been articulated for the doctrine:

(1) Mr. Justice Harlan said in 1963: "The principle that authority granted by the legislature must be limited by adequate standards * * * insures that the fundamental policy decisions in our society will be made not by an appointed official but by the body immediately responsible to the people." *Arizona v. California*, 373 U.S. 546, 626, 83 S.Ct. 1468, 1511, 10 L.Ed.2d 542 (1963) (Harlan, J., dissenting in part).

(2) Mr. Justice Brennan said in 1967: "Formulation of policy is a legislature's primary responsibility, entrusted to it by the electorate, and to the extent Congress delegates authority under indefinite standards, this policy-making function is passed on to other agencies, often not answerable or responsible in the same degree to the people." *United States v. Robel*, 389 U.S. 258, 276, 88 S.Ct. 419, 430, 19 L.Ed.2d 508 (1967) (Brennan, J., concurring in result).

(3) Judge Wright said in 1972: "At its core, the doctrine is based on the notion that agency action must occur within the context of a rule of law previously formulated by a legislative body * * *. When Congress is too divided or uncertain to articulate policy, it is no doubt easier to pass an organic statute with some vague language about the 'public interest' which tells the agency, in effect, to get the job done. But while this observation is no doubt correct, it seems to me to argue for a vigorous reassertion of the delegation doctrine rather than against it. An argument for letting the experts decide when the people's representatives are uncertain or cannot agree is an argument for paternalism and against democracy." Wright, *supra*, 81 Yale L.J. at 583, 584–585.

The Harlan-Brennan-Wright view would use the delegation doctrine so as to implement a primary concern for *accountability*. It would satisfy this primary concern by requiring the fixing of standards in statutes. I agree.

Our system of government becomes basically flawed when our governors are permitted to assume direction of the lives of the governed without accountability to them. Experience may teach us that our economic and social problems have become so complex that it is unrealistic to require the General Assembly to "set standards sufficiently precise to ensure that the relevant agency receives clear signals regarding the policy it is expected to carry out." However, we must make the effort until such time as the people see fit to change the system of government.

The United States Supreme Court has declared that an act of Congress does not constitute an unconstitutional delegation of legislative power "if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority." *American Power & Light Co. v. Securities & Exchange Commission*, 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946). *American Power* was cited with approval in *State ex rel. Priest v. Gunn*, 326 S.W.2d 314, 320 (Mo. banc 1959).

I would hold that the General Assembly "clearly delineates the general policy" only when it *sets standards sufficiently precise to ensure that the relevant agency receives clear signals regarding the policy it is expected to carry out.* Chapter 360 fails to do this with respect to the Authority's powers to lease Authority-owned facilities and to make loans to finance new institution-owned facilities.

Professor Davis expresses a view which, while different in thrust is not incompatible with the Harlan-Brennan-Wright view. In his treatise on administrative law he pays

deference to the idea that "[a]dministrators should not have unguided and uncontrolled discretionary power to govern as they see fit," but asserts that the basic purpose of the delegation doctrine should be changed: "It should no longer be either to prevent delegation of legislative power or to require meaningful statutory standards. * * * The purpose should be to do what can be done through such a doctrine *to protect private parties against injustice on account of unnecessary and uncontrolled discretionary power.*" 1 Davis, *Administrative Law Treatise,* 2d Ed. pp. 206, 208 (1978). The Davis view would hold to "the requirement of meaningful standards, except that when the legislative body fails to prescribe the required standards for discretionary action in particular cases, the administrators should be allowed to satisfy the requirement by prescribing them within a reasonable time." *Id.* at 211.

Davis substantially abandons the concern for accountability. I do not disagree with his purpose nor reject his approach as a *partial* solution to the problem of administrative discretion. Legislative rule-making and agency rule-making are not mutually exclusive. Both may and should be used in the effort "to protect private parties *against injustice on account of unnecessary and uncontrolled discretionary power.*" *See Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa. 1, 331 A.2d 198, 203–204 (1975). However, I believe Davis's concerns are better viewed as a matter of due process.

Article I, § 10 of the Missouri Constitution provides:

"That no person shall be deprived of life, liberty or property without due process of law."

The parties to this litigation do not raise due process claims. Due process concerns should be addressed, however, because they are inherent in grants of administrative discretion, are related to the concerns underlying the delegation doctrine, and because the virtual abandonment, by the principal opinion, of any solicitude for the delegation doctrine and political accountability causes the due process concerns to be increasingly acute.

Due process, as a flexible concept, requires determination of the existence of a private life, liberty or property interest which is the subject of infringement by the state, and of the process that is due to protect the interest. *See Lewandowski v. Danforth,* 547 S.W.2d 470, 472 (Mo. banc 1977), *cert. den.* 434 U.S. 832, 98 S.Ct. 116, 54 L.Ed.2d 92.

The private interests involved here are those of institutions falling within the statutory definitions, § 360.015(4) and (6), proposing facilities falling within the statutory definitions, § 360.015(3) and (5), and, in the case of proposals for refinancing of existing institution-owned facilities, showing that the desired assistance would alleviate financial hardship, result in lesser costs, and produce savings to third parties. If these statutory requirements are met, a health or education institution has a prima facie claim, which, unless one assumes that *all* such claims must be approved, is subject to the discretion of the Authority.

It is beyond argument that, "the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Board of Regents of State Colleges v. Roth,* 408 U.S. 564, 571–572, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). While the precise extent of property protected by Federal due process is unclear, *id.,* a number of courts and authorities indicate that statutory eligibility for a government benefit, as would be at issue here, is protected. *See Elizondo v. State Dept. of Revenue, Motor Vehicle Div.,* 570 P.2d 518, 522 (Colo. banc 1977) (statutory eligibility for probationary driver's license upon suspension of driver's license); *Baker-Chaput v. Cammett,* 406 F.Supp. 1134, 1138 (D.N.H.1976) (statutory eligibility for local general assistance benefits); *Davis v. United States,* 415 F.Supp. 1086, 1090–91 (D.Kan.1976) (statutory and regulatory eligibility for employment disabilities compensation). *See generally,* Reich, *The New Property,* 73 Yale L.J. 733 (1964).

Other courts have found interests protected by due process in similar circumstances without explicitly designating the interest as one of life, liberty or property. *See Holmes v. New York City Housing Authority,* 398 F.2d 262, 264–265 (2nd Cir. 1968) (interest in fair opportunity to petition for admission to public housing and to obtain review of disposition of applications); *Hornsby v. Allen,* 326 F.2d 605, 609–610 (5th Cir. 1964) (applicant's and public's interest in fair and objective disposition of applications for liquor license); *Environmental Defense Fund, Inc. v. Ruckleshaus,* 142 U.S.App.D.C. 74, 439 F.2d 584 (1971) (interest in determination of whether use of pesticide DDT was subject to suspension under statute); *Smith v. Ladner,* 288 F.Supp. 66 (S.D.Miss.1968) (statutory eligibility for not-for-profit corporation charter).

The common thread running through these cases is that private persons have a right to expect that the government will not act in an arbitrary manner in its relations with them. The relationship created by the government with a statutorily defined group in chartering corporations, in providing housing or other assistance, in licensing business, or in financing health and education facilities may or may not create a property interest *per se,* but in establishing a statutory prima facie relationship there is certainly created a liberty interest in being free from arbitrary administration of the relationship.

In each of the cases, cited *supra,* in which a due process interest was found to exist, the court held that due process required the administrator to promulgate the rules or policies which would govern his exercise of the discretion which was vested in him under the relevant statute. Thus, in *Elizondo,* 570 P.2d *supra* at 522, the Court held that:

"[D]ue process requires that the Department of Revenue promulgate rules or regulations to guide hearing officers in their decisions regarding requests for probationary licenses."

In *Environmental Defense Fund,* 142 U.S. App.D.C. at 88, 439 F.2d *supra* at 598, the court reasoned:

"Courts should require administrative officials to articulate the standards and principles that govern their discretionary decisions in as much detail as possible. Rules and regulations should be freely formulated by administrators, and revised when necessary * * *. When administrators provide a framework for principled decision-making, the result will be to diminish the importance of judicial review by enhancing the integrity of the administrative process, and to improve the quality of judicial review in those cases where judicial review is sought."

In *Baker-Chaput,* 406 F.Supp. *supra* at 1140, the court reasoned:

"The absence of standards creates a void in which malice, vindictiveness, intolerance or prejudice can fester. Plaintiff has a paramount interest in receiving those benefits for which she statutorily qualifies. In addition, as a member of our society, she has an interest not only in being treated fairly by the administrative agency, but, just as important, in believing that she has been treated fairly. A standardless method of administration negates these interests."

These same reasons apply to the standardless exercise of administrative discretion under Chapter 360.

I would, therefore, hold that the administrative Authority must proceed in the exercise of discretion granted to it under the statute according to announced rules, policies or criteria. Situations will doubtlessly arise in which an agency is unable to promulgate rules to govern its exercise of discretion and in which ad hoc case by case implementation of statutory power will be necessary. The presumption, however, should be that the agency will proceed by rules or be prepared and able to state why it is necessary to do otherwise.

Because the principal opinion fails to delimit the wide discretionary power delegated to the Authority in Chapter 360, thus diluting Art. II, § 1, Art. III, § 1, and Art. I, § 10 of the Missouri Constitution, I respectfully dissent.