Dear Director Kruse:
This opinion letter is in response to your questions asking:
 1. Is the Missouri Agricultural and Small Business Development Authority (hereinafter referred to as the "Authority") authorized to enter into a special conservation reserve enhancement program with the United States, through the United States Department of Agriculture, in order to institute the special conservation reserve enhancement program on behalf of the State of Missouri?
 2. Is the Authority authorized to enter into binding agreements whereby the Authority will succeed to the rights and obligations of the Conservation Reserve Program contracts executed by participating farmers?
 3. Who is the proper person to sign, on behalf of the Authority, the agreement whereby the Authority will enter into the special conservation reserve enhancement program and the agreements whereby the Authority will succeed to the rights and obligations of the Conservation Reserve Program contracts signed by participating farmers?
The answer to your first question requires an examination of the federal law which provides for the establishment of special conservation reserve programs. Section 322 of Public Law No. 100-387 (hereinafter "Section 322") provides:
 SEC. 322. CONSERVATION RESERVE ENHANCEMENT PROGRAMS.
 Effective beginning with the 1988 crop year, subsection (f) of section 1234 of the Food Security Act of 1985 (16 U.S.C. § 3834(f) is amended by adding at the end thereof the following new paragraph:
 "(4) The provisions of this subsection that limit payments to any person, and section 1305(d) of the Agricultural Reconciliation Act of 1987, shall not be applicable to payments received by a State, political subdivision, or agency thereof in connection with agreements entered into under a special conservation reserve enhancement program carried out by that entity that has been approved by the Secretary. The Secretary may enter into such agreements for payments to States, political subdivisions, or agencies thereof that the Secretary determines will advance the purposes of this subtitle." [Emphasis added.]
Act of August 11, 1988, Pub.L. No. 100-387, 1988 U.S. Code Cong. Admin. News (102 Stat.) 951 (to be codified at16 U.S.C. § 3834 (f)).
The legislative history explains the legislation in the following terms:
 Section 323 (sic) will allow States to establish and to administer Conservation Reserve Programs enhancement measures which meet with the Secretary's approval. Under contracts entered into with participating producers, the State or an entity of the state could provide to a producer a lump sum payment equal to the annual rental payments the producer is due to receive from the Federal government for the full term of the CRP contract. In return for making the lump sum payment to the producer, the state will collect the annual Conservation Reserve Program rental payments directly from the Federal government.
House Report No. 100-800, page 63, reprinted in 1988 U.S. Code Cong. Admin. News 1192, 1231.
The Authority's proposed program, as it was briefly described in your opinion request, appears to be the type of program which Congress intended to promote by passing Section 322. The central question, therefore, is whether the Authority is a state, political subdivision, or agency thereof within the meaning of Section 322, capable of entering into a special conservation reserve program agreement.
Section 348.020, RSMo 1986, creating the Authority, provides:
 348.020. Authority created — powers to vest in commission — commissioners, number, appointment, qualifications. — There is hereby created, with such duties and powers as are set forth in sections 348.005 to 348.180 to carry out the provisions hereof, a body politic and corporate, not a state agency, but an independent instrumentality exercising essential public functions, to be known as the "Missouri Agricultural and Small Business Development Authority" . . .
The language used in creating the Authority makes the Authority an entity separate from the State to the extent that the Authority may issue bonds and perform other functions that the State itself would be prohibited from performing under such sections as Article III, Sections 39(1) and (2) of the Missouri Constitution. See State ex rel. Farmers' ElectricCooperative, Inc. v. State Environmental Improvement Authority,518 S.W.2d 68 (Mo. banc 1975) and Menorah Medical Center v.Health and Educational Facilities Authority, 584 S.W.2d 73 (Mo. banc 1979).
By inserting the phrase "not a state agency," which is included in Section 348.020, the General Assembly made it clear that the Authority's obligations are not those of the State, and thus brought the Authority's activities within the protection ofState ex rel. Farmers' Electric Cooperative, Inc. and MenorahMedical Center.
Like the Missouri Housing Development Commission, however, the Authority is an instrumentality through which the State provides a service it could not otherwise provide. See
Missouri Attorney General Opinion No. 168, Antonio, 1981. Because the Authority is such an instrumentality, it can be considered an agency of the State where "agency" is given its broadest meaning. "Agency" has been defined as "that by which something is done; means; instrumentality." Webster's NewWorld Dictionary, (2d ed. 1978). Similarly, "agency" has been defined as "every relation in which one person acts for or represents another by the latter's authority." Black's LawDictionary (4th ed. 1951). Under these broad definitions of "agency," the Authority, as an instrumentality of the State, can be considered an entity capable of entering into the agreement contemplated by Section 322. This reading would not detract from the conclusion that under state law, the Authority is not a "state agency" that would be prohibited by the Missouri Constitution from engaging in certain activities which the General Assembly authorized the Authority to undertake.
The Authority's purposes, as outlined in Section 348.010, RSMo 1986 and the Authority's powers, as set forth in Section348.070, RSMo 1986, indicate that the Authority is particularly well suited to carry out the purpose of Section 322.
The legislative history of Section 322 provides that, "[u]nder contracts entered into with participating producers,the State or an entity of the state could provide to a producer a lump sum payment equal to the annual rental payments the producer is due to receive from the Federal government for the term of the CRP contract." Congress' use of the words "the State or an entity of the state" seems to indicate that Congress wanted the program to be carried out by some suitable "entity" capable of carrying out the purposes of the law. Neither Section 322 nor the legislative history indicates that Congress wanted to ensure that a participating state would pledge its full faith and credit in support of any obligations that might need to be issued to carry out the purposes of Section 322. If Congress had intended to so narrowly restrict the way in which the purpose of Section 322 was to be undertaken, it could certainly have used more precise language. Therefore, in answer to your first question, we conclude that the Authority, an instrumentality of the State, is a proper entity to enter into the agreement contemplated by Section 322.
Your second question concerns the Authority entering into agreements with the participating farmers. In order to answer your second question, we must turn again to the legislative history of the federal law in question, which provides:
 State CRP participation: The bill will revise the conservation reserve program payment limitation rules to enable States and local governments to enter into agreements with farmers who are CRP participants. Under such agreements, the state or local government would advance CRP rental payments in a lump sum to the farmer in need of operating capital and the State or local government would, in effect, take over the farmer's CRP contract.
House Report No. 100-800, page 32, reprinted in 1988 U.S. Code Cong. Admin. News 1192, 1199.
The last clause of the preceding quote clearly indicates that Congress intended for the entity operating the special conservation reserve program to succeed to the rights and obligations of the CRP contracts executed by farmers seeking to participate in the special conservation reserve program, "the State or local government would, in effect, take over the farmer's CRP contract." The Authority's power to "take over" the CRP contract rights and obligations of farmers seeking to participate in the special conservation reserve program is found in the broad statutory grants of power in Sections 348.010.1(7),348.070, and 348.090, RSMo 1986. Based on the Authority's power under state law and the congressional purposes underlying the federal law in question, we conclude that the Authority may enter into binding agreements whereby the Authority will succeed to the rights and obligations of the participating farmers executing CRP contracts.
Your third question concerns the proper person to sign the various agreements. Section 348.020, RSMo 1986, vests the powers of the Authority in seven commissioners, appointed by the Governor with the advice and consent of the Senate. Section348.050, RSMo 1986, provides, in part:
 Four commissioners of the authority shall constitute a quorum, and any action taken by the authority under the provisions of sections 348.005 to 348.180 may be authorized by resolution approved by a majority, but not less than four, of the commissioners present at any regular or special meeting.
Section 348.060, RSMo 1986, states that the commissioners shall employ an executive director who is granted the following authority and duties:
 The executive director shall be the secretary of the authority and shall administer, manage, and direct the affairs and business of the authority, subject to the policies, control, and direction of the commissioners. . . . The commissioners may delegate to the executive director, or to one or more of its agents or employees, such powers and duties as it may deem proper.
Assuming the commissioners authorized, by a resolution approved by a majority, but not less than four, of the commissioners, the signing of the special conservation reserve enhancement agreement with the United States Department of Agriculture (hereinafter "USDA"), the commissioners may then delegate to the executive director the actual task of physically signing the agreement with USDA. Similarly, if the commissioners authorized, by resolution approved by a majority, but not less than four, of the commissioners, the signing of a standard agreement with various farmers whereby the farmers assign the CRP contracts to the Authority, then the commissioners could delegate to the executive director the authority to sign the individual agreements with the farmers. This would facilitate the signing of the numerous agreements with the various farmers likely to participate in this program. Of course, the commissioners could sign each and every agreement themselves. Therefore, in answer to your third question, we conclude that the commissioners, themselves, may sign the agreements on behalf of the Authority or the commissioners may delegate to the executive director the authority to sign the agreements.
very truly yours,
 WILLIAM L. WEBSTER Attorney General